Margaret Hunt HILL, Individually, Margaret Hunt Hill, Executrix (of the Estate of Al G. Hill, Deceased), Margaret Hunt Hill, Trustee (of the Margaret Hunt Hill Marital Trust), Chester J. Donnally, Jr., Trustee (of the Margaret Hunt Hill—Albert G. Hill, III, Trust, Heather Victoria Hill Trust, Elisa Margaret Hill Trust, Michael Busch Wisenbaker, Jr. Trust, Wesley Hill Wisenbaker Trust, Cody McArthur Wilert Trust and the Margretta Hill Wilkert Trust), Lyda Hill, U.S. Financial Corp., Seven Falls Co., Stuart Hunt, Sherman Hunt, Hara Hunt, Hilre Hunt, and The Kickham Group, Inc., Appellants,

v.

HERITAGE RESOURCES, INC., Wise Oil Ventures, Crittendon Acquisition Co., Michael B. Wisenbaker and The Chase Avenue Corp., and Van Oliver, As Trustee for Certain Trade Creditors of Heritage Resources, Inc., Appellees.

No. 08–93–00266–CV.

Court of Appeals of Texas, El Paso.

Dec. 31, 1997.

Rehearing Overruled Feb. 18, 1998.

W. Alan Wright, Thomas E. Kurth, Haynes & Boone, Dallas, Michael L. Fostel, Dist. Atty., Kermit, Ronald Holman, Holman, Robertson, Eldridge, Biddle & McCorkindale, Dallas, Ken Slavin, Brower & Slavin , El Paso, Julia E. Vaughan, Cotton, Bledsoe, Tighe & Dawson, Midland, for Appellants.

Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, Stephen F. Malouf, Edward Wayne Malouf, Marcellene Malouf, Dallas, L. Wayne Scott, San Antonio, Steve Cundra, Thompson, Hine & Flory, Washington, DC, D. Ronald Reneker, Douglas James Buncher, Craig Madison Patrick, Bush Craddock & Reneker, L.L.P., Dallas, for Appellees.

Before LARSEN, McCLURE and CHEW, JJ.

### OPINION

CHEW, Justice.

This is yet another oil and gas case originating from the attempted removal of the Operator of a Joint Operating Agreement. In this case, the Operator and its affiliates filed suit against a confederated group of the largest Non–Operators alleging multiple tort and breach of contract claims. The Non–Operators responded with counterclaims for breach of contract by the Operator and injunctive relief to remove the Operator. The case was tried to a Winkler County jury, and the Operator won on all issues and was awarded a judgment of over $83 million dollars in damages and prejudgment interest and approximately $21 million dollars in attorneys' fees. In this appeal, the Non–Operators have challenged the jury's findings on all issues and the Operator has cross-appealed on the issues of prejudgment interest and attorney's fees.

### I.

### Summary of the Facts

#### A. The Parties.

The Operator and its affiliates, plaintiffs below and Appellees here, are Heritage Resources, Inc., Wise Oil Ventures, Michael B. Wisenbaker, Chase Avenue Corporation, and Crittendon Acquisition Company. They are also joined by Van Oliver, as trustee for trade creditors of Heritage Resources, Inc., an intervening party. Michael Wisenbaker is the principal of all the corporations except for Wise Oil Ventures, which is owned by his father. Wisenbaker, a self-described oilman, has been an independent oil and gas venturer since the early 1970s. He was once married to the daughter of Mr. A.G. Hill, Sr. and Mrs. Margaret Hunt Hill. The Appellees are hereafter referred to as "Heritage."

The Non–Operators, defendants below and Hunt/Hill here, principally consist of two related families. The first family was headed by A.G. Hill, Sr., a prominent oil and gas businessman, who died shortly after this litigation began. He was survived by his wife, Margaret Hunt Hill, who was named a defendant, individually and as Executrix and Trustee of her husband's estate. Also named in the suit were the trusts of the Hills' seven grandchildren and their daughter, Lyda Hill. They comprise, together with two closely held family corporations, Seven Falls Company and U.S. Financial Corporation, what will be referred to as the "Hill Group." The other family includes the brothers, Sherman and Stuart Hunt, and their closely held corporation, the Kickham Group, Inc., and two Hunt daughters, Hara and Hilre. They are collectively referred to as the "Hunt Group." The Appellants as a whole will be referred to as "Hunt/Hill."

#### B. The Dispute.

In the early 1980s, Heritage acquired oil and gas leases in several sections of the

Crittendon Field in Winkler County, Texas. Heritage sold substantial, partial interests in these leases to A.G. Hill, Tribal Drilling (a Hunt family partnership), and the Hunt brothers individually. In November 1984, Heritage, as the Operator, entered into a Joint Operating Agreement ("22 J.O.A.") for Section 22 of the Crittendon Field with Tribal Drilling Company and A.G. Hill and a number of other smaller working interest owners, using A.A.P.L. Form 610–1982 Model Form Operating Agreement. The contract area defined by Exhibit "A" of the 22 J.O.A. was for all of Section 22 "[t]o a depth of 20,000' or to a depth sufficient to thoroughly test the Fusselman formation, whichever is the lesser depth."

From our review of the 14,000 plus page record, we have distilled the facts of the case to the following narrative chronology beginning in 1985:

**1985**

October 23 A Joint Operating Agreement for the adjacent Section 21 was entered into by essentially the same parties as the 22 J.O.A.

**1986**

August Heritage circulated an Authorization for Expenditures "AFE," which proposed the 22–2 well. The AFE requested consent for drilling a new well with an objective depth limitation of the lesser of 22,000 feet or depth sufficient to test the **Ellenburger** formation (a geological stratum located in the Crittendon Field at an approximate depth of 21,500 to 22,000 feet below the surface and approximately 1000 feet thick). Heritage and all the Non–Operators, except Hunt/Hill, consented to the AFE. For their part, Hunt/Hill agree to a second AFE which provided for a depth limitation of the lesser of 20,000 feet or depth necessary to test the **Fusselman** formation (a geological stratum located in the Crittendon Field at a depth of approximately 19,300 feet below the surface and approximately 800 feet thick).

November 2 The 22–2 well was spudded.

November 18 Heritage and the two Hunt brothers entered into a Letter Agreement for 22–2 well and "subsequent" wells which authorizes deeper drilling, in stages, of the 22–2 well beyond 20,000 feet, with the Hunts' prior consent.

**1987**

April 29 Tribal Drilling Company, Sherman Hunt, Stuart Hunt, and other members of the Hunt Group entered into a letter of agreement stipulating their proportionate shares of the drilling, testing, and completing costs attributable to the proposed 22–2 well and any subsequent wells in Section 22. The letter acknowledged that Sherman and Stuart Hunt agreed to pay 37.5 percent of all costs attributable to the 22–2 well and 18.75 percent of all costs attributable to any subsequent wells drilled in Section 22 pursuant to their letter of agreement with Heritage dated November 18, 1986.

May As drilling on the 22–2 well neared 19,000 feet, the operations became more tenuous. Hunt/Hill requested that the 22–2 well's drilling cease and that the well be put into production, but Heritage continued the drilling.

May 10 Heritage and Oxford Oil and Gas, Inc. "Oxford" entered into a letter of agreement whereby Oxford agreed to pay 64.5 percent of the drilling costs of the 22–3 well in exchange for an assignment of a 33.333334 percent working interest in the 22–3 well. Oxford had the option to quit paying at any time and to receive a proportionately reduced interest once the well was completed. The agreement was expressly subject to the terms of the 22 J.O.A. (This document was dated May 10, 1987. There was some testimony, however, that the letter of agreement was not actually executed until September 1987).

May 19 The 22–2 well blew out, but drilling operations were restored within several days. A meeting of interest owners was held and the Hills and Hunts orally agreed to participate in a subsequent well, the 22–3 well, provided that the drilling on the 22–2 well stopped and it was put into production.

May 22 The 22–2 well reached the **Silurian** formation (a geological stratum located

in the Crittendon Field at an approximate depth of 18,900 to 19,300 feet below the surface and approximately 300 feet thick).

June 20 The 22–2 well was completed at a depth of 19,062 feet below the surface and placed in production. Production pressure tests indicated a potential Texas record for gas reserves.

June 30 Heritage issued an AFE proposal for the new or substitute well—the 22–3. The AFE was for a new location and a depth of 22,000 feet or a depth sufficient to test the **Ellenburger** formation, whichever was less. Hills and Hunts did not respond to the AFE. The Hunts began an analysis of their investment in the Crittendon Field and began negotiations with Lyco Energy Corp. to sell their entire interest in the Crittendon Field.

September 25 The Hunt Brothers secretly recorded a conversation with Michael Wisenbaker. The Hunts told Wisenbaker that: (1) they were not contemplating the sale of their interests in the Crittendon Field; (2) they wanted a Joint Operating Committee to oversee Crittendon Operations with J.R. Latimer as Operator for the committee; (3) they wanted to stop all drilling activities in Section 22; and (4) they had the requisite votes to remove Heritage as Operator and would do so unless Wisenbaker agreed with the Hunts. They were informed that Heritage was in negotiations with Enserch Gas Company and Lone Star Gas Company "Enserch/Lone Star" for prepayment gas contracts, and that Heritage was going forward with the 22–3 well and would not resign as Operator.

September 25 Heritage sent the working interest owners an **Ellenburger** AFE for the proposed 22–3 well. The AFE proposed a total depth of 22,000′ or to a depth sufficient to test the **Ellenburger** formation whichever was shallower.

September 27 Tribal Drilling notified Heritage that it is opposed to the 22–3 well.

September 28 The Hunts notified Heritage that a "vote" of the Non–Operators had been taken, and that a majority voted to remove Heritage for "failure and/or refusal to carry out its duties as Operator" of Sections 21, 22, and 23, but that there was not a majority voting for removal with respect to the other two wells. The letter stated that Tribal Drilling would take over operations and that Heritage should only perform "routine and necessary production, operating, and maintenance operations" until Tribal Drilling took over. Wisenbaker telephoned Sherman Hunt and told him that Heritage will not resign as the Operator.

September 29 Heritage informed the Hunt Brothers by letter that Heritage properly carried out its duties as Operator and that it would not resign.

October 1 J.R. Latimer reported large gas reservoir in the **Ellenburger** formation.

October 5 The Hunt brothers sent a letter to Heritage requesting that no further operations be conducted until they sold their interests.

October 14 Heritage distributed a second AFE, an **Ellenburger** AFE for the 22–3 well, to the Hunts, Hills, and to all the other Section 22 working interest owners.

October 26 An Operator's meeting was held to discuss the 22–3 well. Heritage confirmed that the proposed 22–3 well's formation objective was the **Ellenburger**. The Hunts objected to the drilling of the 22–3 well on the basis that Heritage was "selling out" and the working interest owners would not know "who they are going to be in bed with."

November 10 Hill signed an **Ellenburger** AFE for the 22–3 well, conditioned upon: (1) the 22 J.O.A. be amended to 22,000 feet; (2) Hill retain an option of waiting until the well reached the **Woodford** Shale before deciding to go "consent" to the **Ellenburger**; (3) costs be billed in accordance with a revised ownership schedule; and (4) all working interest owners received title opinion in time to review prior to spudding the 22–3 well.

Gregg Ewing of A.G. Hill Oil Producer sent a letter to Heritage. The letter stated that pursuant to the October 26,

1987 meeting, A.G. Hill reviewed the AFE dated September 25, 1987, for the 22–3 well and determined that the proposed 22–3 well is outside the contract area of the Section 22 J.O.A. Ewing advised Heritage that the J.O.A. must be amended to cover the 22–3 well and that A.G. Hill's execution of the AFE was subject to Heritage's agreement to amend the Section 22 J.O.A.

November 23 Heritage furnished the Hunts with an executed depth-limited assignment.

November 30 The Hunts signed a sale agreement with Lyco for the sale of Tribal Drilling's interest in the Crittendon Fields for $20 million and part of future production.

November 25 The Hunts then directed their attorneys to contact Heritage and advise it that since the contract area for the 22 J.O.A. was 20,000 feet, or a depth sufficient to test the **Fusselman**, the objective depth of the proposed 22–3 well was outside the contract area. Attorneys for the Hunts sent Heritage a letter stating: (1) the 22–3 well is a proposed operation outside the "contract area" of the J.O.A.; (2) the J.O.A. does not govern operations outside the "contract area;" (3) the Hunts demand a full and complete accounting for all costs and revenues attributable to the 22–3 well; (4) Heritage and the Hunts are tenants-in-common as to the 22–3 well; and (5) if it is ever determined that the 22–3 well is governed by the J.O.A. (i.e. within the "contract area"), the Hunts will elect to be either "consent" or "non-consent" at that time.

December The Hunts then hired Newton Ballou to audit Heritage's books and operations from 1985 through 1987. The auditor concluded that Heritage was in good to excellent condition and that out of $4 million in expenses, only $8,000 had been improperly coded.

December 1 Heritage sent a third AFE for the 22–3 well with an objective depth of 20,000 feet, or a depth sufficient to test the **Fusselman** formation, whichever was the lesser depth.

December 2 Sherman Hunt and Virgil St. Clair, Exploration and Development Manager for A.G. Hill, met to discuss how the Hills could help in stopping the drilling of the 22–3 well.

December 8 Hunts' lawyer sent a letter to Heritage demanding an assignment of interest from Heritage under all of Section 22 from the surface down to 19,164 feet below the surface. The letter further stated that the Hunts rejected the proposed assignment of interest that Heritage delivered on November 23, 1987.

December 9 Mike Wisenbaker met with A.G. Hill, Jr. at the latter's offices. Hill advised Wisenbaker that if he attempted to drill the 22–3 well, that Hunt/Hill would claim that Heritage was a bad faith trespasser and seize all gas production should the well be successful. Mike Wisenbaker alleged that Hill warned that Heritage would be "squashed ... like a bug" if he did not accept a new Operator.

December 10 Virgil St. Clair sent Heritage a letter on behalf of the Hills stating that they had "discovered that Heritage does not have a working interest" in Section 22, which is a deemed resignation of operatorship under the terms of the 22 J.O.A. The letter further stated that Hill was nominating Tribal Drilling to assume operatorship and they would poll the other working-interest owners. The letter was a collaborative effort between the Hunts and Hills.

December 15 Virgil St. Clair, on behalf of A.G. Hill, sent a letter to Heritage stating that Tribal Drilling received a majority of the working interest vote to operate the 22–2 well.

December 16 Anadarko Petroleum Corporation's memo indicated that Hunt/Hill advised Anadarko Petroleum Corporation that Heritage did not have an interest in the Crittendon Field. The memo referenced a letter from A.G. Hill that stated it was unnecessary for Anadarko to respond to the 22–3 well AFE because the 22–3 well was outside the Section 22 J.O.A.'s parameters and Heritage "has

no revenue interest, which is interpreted to read that it has no *economic interest* ... therefore, no interest" [emphasis added] in Section 22.

December 17 Virgil St. Clair, on behalf of A.G. Hill sent Heritage a reply to Heritage's December 17 letter stating that although Heritage Resources, Inc. was record title owner, a Supplemental Division Order Title Opinion showed that Heritage Resources, Inc. did not have actual ownership.

December 18 Hunt/Hill published a letter, on behalf of Tribal Drilling and all working interest owners claiming that Heritage was a bad faith trespasser on Section 22. Tribal Drilling filed suit against Heritage in state court in Dallas, County. Tribal Drilling sought a declaratory judgment that Heritage had no interest in the field and a temporary restraining order to cease Heritage's operations and turn them over to Tribal Drilling. Three hours later Heritage filed this instant suit in Winkler County alleging: (1) breach of contract; (2) slander of title; (3) cloud on title; (4) tortious interference with contract; (5) tortious interference with business relations; and (6) intentional/negligent infliction of emotional distress.

December 18 Wisenbaker and Wisenbaker Production Company transferred their interests in Section 22 to Heritage.

December 23 Hunt lawyers sent a letter to Heritage lodging objections to 22–3 well.

December 28 Heritage began drilling the 22–3 well.

**1988**

January 29 Hunt lawyers sent a letter to Heritage that they had opinion that the 22–2 well had been drilled to depth sufficient to test the **Fusselman** formation. The letter demanded that Heritage assign all deep rights under the letter agreement to the Hunt Group.

March 21 Heritage notified the Non–Operators by letter that it was going to market the non-consent interests to the 22–3 well. Immediately, the Non–Operators protest the sale of the non-consent interests. Attorneys for A.G. Hill, U.S. Financial, and Lydia Hill sent a letter to all working interest owners advising of the Dallas litigation seeking to obtain a declaratory judgment that Heritage had been removed as Operator and detailing the alleged improprieties by Heritage in continuing operations to drill the 22–3 well. The letter further stated the consent or non-consent requirements of the 22 J.O.A. were not applicable because of Heritage's status of title, and opined that Heritage's actions in drilling the 22–3 well put Heritage in either a cotenancy or bad faith trespass.

April 8 Heritage sent a letter to Jack Bestrom and Jerry Anderson notifying them that Best Energy Corporation, Insured Energy Production, Inc., and Oxford owed Heritage $1,072,211.05 as their proportionate share of the drilling operations for the 22–3 well. More than $200,000 of this amount was over 90 days past due. Oxford's share of the total amount due was $702,390. Heritage suspended revenue to all three companies until the balance due was paid.

May 17 Heritage filed a second suit in Winkler County seeking damages and declarations that it was the rightful Operator.

Heritage sent a letter to the "consenting" working interest owners regarding the "Non–Consent Interests." Heritage takes the position that those parties who have failed to respond to Heritage's proposal to drill the 22–3 well, most notably the Hunt and Hill Groups, are now "Non–Consent Interests" and that Heritage has the right under the J.O.A. to market these "Non–Consent Interests." Heritage asserted that these interests were "Non–Consent" since March 20, 1988.

May 26 Heritage and Best Energy Corporation (Jack Bestrom) entered into a contract for the sale and purchase of a portion of the non-consent interests. Best Energy Corporation contracted to purchase 28 percent of the working interest to the 22–3 well. The estimated drilling costs attributable to this working interest were $2,000,000. The sale was

made subject to the successful removal of the cloud on Best's acquired title. The cloud was the claim by Hunt/Hill that there were no non-consent interests to market.

August 25 Oxford made its last payment of costs for the 22–3 well in the first week of August. At approximately this time, Oxford decided that it would no longer pay for any of the drilling costs of the 22–3 well that are attributable to the non-consent interests that were marketed by Heritage. Oxford also ceased any attempts to sell a portion of the non-consent interests.

August Heritage informed Jerry Anderson, president of Oxford, and Oxford that it believed Oxford's conduct was fraudulent. Heritage informed Anderson that Heritage would have no further business involvements with Oxford.

November 2 J.D. Ochsner, the District Manager of the Western Division of the Gas Purchases Department of Lone Star Gas Co., sent a letter to the president and vice-president of Lone Star Gas Co. seeking approval for revisions to the proposed prepayment gas purchase contracts between Enserch/Lone Star and Heritage.

December 6 J.D. Ochsner sent Heritage a letter confirming the status of ongoing negotiations between Heritage and Enserch/Lone Star. Enserch/Lone Star forwarded revised prepayment gas purchase contracts to Heritage's New York counsel for review. Enserch Gas Co. also sent Heritage's counsel proposed loan agreements between Wise Oil Ventures and Enserch Gas Co.

December 7 Ochsner sent the president of Lone Star Gas Co. a memo stating that Heritage hopes to be able to sign the prepayment gas purchase agreements within two to four working days.

### 1989

January 31 Heritage and Sun Exploration and Production "Sun" began to negotiate a contract for the sale and purchase of all or a portion of Heritage's interests in the Crittendon Field.

March 9 A verbal commitment was made by Sun to purchase Heritage's interests. The 22–2 well began coning or producing water in large quantities; gas production was significantly reduced.

March 13 Heritage informs Sun that the 22–2 well began to produce significant amounts of water. Sun withdrew its offer to purchase Heritage's interests.

July 14 Heritage sent a letter to the Hunt brothers stating that the Hunts failed to earn any interests in Section 22. Heritage stated that the Hunts were required to pay 37.5 percent of all costs for the 22–2 well and 18.75 percent of all costs on subsequent wells in Section 22. Heritage alleged that the Hunts failure to pay 18.75 percent of the costs for the 22–3 well caused the Hunt's purported interests in Section 22 to revert to Heritage. Heritage offered to reinstate the Hunts' interests if the Hunts tendered payment for 18.75 percent of the costs associated with the 22–3 well.

August 4 Heritage filed Plaintiff's First Supplemental Original Petition seeking recovery of the 22–2 well revenues previously paid to the Hunts on the grounds that the Hunts failed to meet the required conditions to earn the 3/16ths interest in Section 22 under the terms of the November 1986 letter of agreement.

December 20 Dan Ryser, executive vice-president of Enron Gasbank "Enron," sent Heritage a Letter of Intent. The letter expressed the parties' intent to enter into good faith negotiations for Enron's purchase of interests from the Heritage group. Enron and Heritage expressed an intent to close negotiations and enter into an agreement by January 15, 1990.

### 1990

January 24 Steve Wisenbaker notified Bank One that Enron was unable to complete the transaction with Heritage. After six months of negotiations, the parties scheduled a closing date for the purchase of Heritage's interests. However, prior to the closing date, the president of Enron was terminated. Enron notified

Heritage that it would be unable to proceed with the closing schedule.

**1992**

May 1 Heritage filed its First Amended Petition alleging that Hunt/Hill: (1) breached their obligations under the J.O.A. by both refusing to participate in the 22–3 well and refusing to go "non-consent;" (2) wrongfully received production payments from the 22–2 well that were contingent upon participation in the 22–3 well; (3) conspired to wrongfully remove Heritage as Operator of Sections 21, 22, and 23; (4) breached their obligations under the J.O.A. by attempting to wrongfully remove Heritage as Operator; (5) willfully and maliciously violated a court order by interfering with Heritage's ability to continue as Operator; (6) tortiously interfered with the business relations of Heritage and third parties as Heritage was attempting to enter gas sales agreements and negotiating for the sale of its interests in the Crittendon Field; (7) breached their duty under the J.O.A., or alternatively tortiously interfered with contracts or business relations between Heritage, the consenting working interest owners, and third parties by refusing to pay their share of the drilling costs of the 22–3 well and interfering with Heritage's right to sell the non-consent interests; (8) slandered Heritage's title to interests in the Crittendon Field; and (9) failed to earn any additional interests in Section 22.

## II.

### Introduction to the Discussion

Hunt/Hill's futile attempts to remove Heritage as the Operator of the 22 J.O.A. and their opposition to well operations subsequent to the 22–2 well are the evident origins of this marathon litigation. It also appears clear that the Hunts were motivated by their desire to sell their interests in the Crittendon Field and that the marketability of those interests were restricted by Heritage's position as the Operator. The Hills' motivation is less clear, though it seems more focused on their concerns with the conduct of field operations by Heritage. Nonetheless, the essential facts of this case are largely undisputed and relatively uncomplicated. These facts, however, are enveloped within the mass and maze of a record typical of oil and gas cases, and groaning further from the Byzantine nature of joint operating agreements. Not surprisingly, the author has spent many months wandering in strange and mostly wrong valleys searching for the answers to the imponderables presented in this case.

Basically, this is a case where the Joint Operating Agreement Operator has alleged commercial and tort causes of action arising as a consequence of the actions of Non–Operators in attempting to remove him as the Operator and to prevent subsequent well operations. These causes of action include tortious interference, slander of title, and fraud. On the other side, the Hunt/Hill's claim that Heritage breached the Joint Operating Agreement ("J.O.A.") and was not legally qualified to serve as the Operator under the J.O.A. The jury generally found for Heritage and rejected all of Hunt/Hill's claims.

Heritage, recovered under three theories of tort liability: (1) tortious interference with contract and business relationship; (2) slander of title; and (3) fraud. Each of these causes of action were premised upon essentially six distinct actions alleged and proven. These were:

- the negotiations and agreement between Hunt and Lyco Energy regarding the sale of Hunt's interest in the Crittendon Field, which included contingencies that there be no further drilling operations after the 22–2 well and that Heritage be replaced as the Operator by Lyco Energy;
- the purported September 28, 1987 vote of the Non–Operators to remove Heritage as the Operator and replace it with Tribal Drilling;
- the December 10, 1987 vote of the Non–Operators conducted by Hunt/Hill to remove Heritage as the Operator on the basis that Heritage lacked a proper ownership interest in the 22 J.O.A.; and publication of Hill's letter of December 1987 stating that Heritage had no legal interest in the 22 J.O.A.;

- Hill's attorney's letter of December 18, 1987, which stated that Heritage was at best a co-tenant in the 22–3 well or worst a "bad faith trespasser;"
- the declaratory litigation initiated by Hunt/Hill against Heritage in Dallas County shortly before the instant action was filed by Heritage; and
- the Hunts' oral agreement with Heritage to participate in the 22–3 well in exchange for Heritage stopping and completing the 22–2 well short of the objective depth and formation.

The jury concluded that as consequences of these actions:

- Heritage's title in the 21 and 22 J.O.A.s was slandered;
- Heritage's agreements to sell to third parties the non-consent interests which Heritage carried in the 22–3 well were tortiously interfered with;
- the gas purchase agreement that Heritage had with Oxford was tortiously interfered with;
- the agreement Heritage had with Sun for the sale of Heritage's interest in the Crittendon Field was tortiously interfered with;
- Heritage's prospective business relationship with Enserch/Lone Star and Enron oil companies was tortiously interfered with; and
- the Hunts' promise and failure to pay their share of costs of the 22–3 well constituted a fraud against Heritage.

Hunt/Hill raise sixty-three cardinal points of error, most containing two to six subpoints. We have chosen to consider together those points that are the same, similar, or related and are divided into the following categories:

- that the claims sound in contract not tort;
- that no non-consent interests were created;
- that some or all claims are barred by the statute of limitations;
- that the evidence was legally and factually insufficient;
- that Hunt/Hill's conduct was justified;
- that Hunt/Hill's conduct constituted fraud;
- that Hunt/Hill breached an oral contract to develop the 22–3 well;
- the remainder of points and cross-points of error.

## III.

### Contract or Tort?

*Points of Error 1a, 5a, 9a, 13a, 17a, 23a, 27a, 31a, 35a, 39a, and 53a.*

We consider first Hunt/Hill's complaints that Heritage is barred as a matter of law from any tort recovery in this suit because all of the latter's claims sound only in contract and the jury made no findings of breach of contract. Hunt/Hill also claim that Heritage did not submit breach of contract to the jury; however, we immediately disagree with that claim. In response to jury Question 8, the jury found that the 22–3 well was covered by the 22 J.O.A. Further, in response to jury Question 11, the jury found that Hunt/Hill's failure to comply with the 22 J.O.A. was not excused. Thus, we find that jury implicitly found that Hunt/Hill breached the 22 J.O.A. This finding does not, however, extinguish Hunt/Hill's complaint.

Hunt/Hill has broadly argued that Heritage's claims only sound in contract and not in tort. On the other side of this looking glass, Heritage counters just as broadly that this is simply a tort case. Justice Larsen has noted that the "law of 'contorts' is a muddy area, devoid of bright line rules or easy answers as to what conduct constitutes a tort, and what a breach of contract. The acts of a party may breach duties in tort or contract alone, or simultaneously in both." *Airborne Freight Corp., Inc. v. C.R. Lee Enterprises, Inc.,* 847 S.W.2d 289, 293 (Tex. App.—El Paso 1992, writ denied). The practical importance of "contorts" or business torts is the fact that one cannot recover exemplary damages for the mere breach of contract, but if the claim is accompanied by an independent tort then exemplary damages can be recovered. Under such circumstances, in addition to the exemplary damages awardable because of the tort claim,

attorney's fees are recoverable because of the breach of contract claim.

## A. Standard of Review

The legal issue presented by these points of error, the theory of recovery or defense, involve several rulings by the trial court: overruling objections to questions in the jury charge; and motions for a directed verdict; to disregard jury findings; for judgment n.o.v.; and for new trial. These are all predicated upon a question of law reviewable by this Court *de novo*. *Phillips Pipeline Co. v. Richardson*, 680 S.W.2d 43, 48 (Tex.App.—El Paso 1984, no writ)(jury questions); *State Nat'l Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661, 669 (Tex.App.—El Paso 1984, writ dism'd by agr.)(directed verdicts); *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990)(judgment n.o.v.); *Kraus v. Alamo Nat'l Bank of San Antonio*, 586 S.W.2d 202, 208 (Tex.Civ.App.—Waco 1979), *aff'd and cited with approval*, 616 S.W.2d 908, 910 (Tex.1981)(disregarding jury findings). Ordinarily, we review the record in the light most favorable to the findings, considering only the evidence and reasonable inferences that support the finding and rejecting all evidence and inferences contrary to the finding. *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 201 (Tex.1980); *Best*, 786 S.W.2d at 671. Here, however, the issue is presented and considered as a pure question of law reserving the evidentiary factors necessary to sustain or dismiss the legal theory under the sufficiency evidence points which are considered below. Thus presented, the scope of our review is truly plenary and includes the entire non-evidentiary portion of the record. We consider therefore the causes of actions pleaded and the contract to determine as a question of law whether Heritage's claim sounds only in contract and not tort.

## B. Heritage's Business Tort Causes of Action ("Contorts").

### 1. Tortious Interference with a Contract or Prospective Business Relationship.

■ Texas law protects existing and prospective contracts from interference. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex.1990). The principal difference between the two involves the requirement of a contract as opposed to a potential for a contract and the question of justification or defense which is borne by the defendant in a tortious interference with contract case. To recover for tortious interference with an existing contract, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that the act was the proximate cause of the plaintiff's damage; and (4) that actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex.1995); *Juliette Fowler Homes*, 793 S.W.2d at 664; *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.).

■ To establish a cause of action for a prospective business relationship, the plaintiff must show: (1) the reasonable probability that a contractual relationship would have been entered; (2) an intentional, malicious intervention with the formation of that relationship; (3) without privilege or justification; and (4) resulting in actual damage or loss. *Gonzalez v. San Jacinto Methodist Hosp.*, 905 S.W.2d 416, 421 (Tex.App.—El Paso 1995), *rev'd on other grounds sub nom.*, *Calvillo v. Gonzalez*, 922 S.W.2d 928 (Tex. 1996). It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). More than mere negotiations must have taken place. *Caller–Times Publ'g Co., Inc. v. Triad Communications, Inc.*, 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ); *Grace v. Zimmerman*, 853 S.W.2d 92, 95 (Tex.App.—Houston [14th Dist.] 1993, no writ).

### 2. Slander of Title.

■ Slander of title is defined as a false and malicious statement made in disparagement of a person's title to property which causes him special damage. *Hauglum v. Durst*, 769 S.W.2d 646, 653 (Tex.App.—Cor-

pus Christi 1989, no writ); *Sadler v. Duvall,* 815 S.W.2d 285, 293 (Tex.App.—Texarkana 1991, writ denied). The elements are: (1) the uttering and publishing of the disparaging words; (2) that they were false; (3) that they were malicious; (4) that the plaintiff sustained special damages thereby; and (5) that the plaintiff possessed an estate or interest in the property disparaged. *American Nat'l Bank & Trust Co. v. First Wisconsin Mortg. Trust,* 577 S.W.2d 312, 316 (Tex.Civ. App.—Beaumont 1979, writ ref'd n.r.e.).

### 3. Fraud.

■ To prove fraud, a plaintiff must establish that (1) a material misrepresentation was made, (2) the speaker knew it was false when made or made it recklessly without any knowledge of its truth, (3) the representation was made with the intent that it should be acted upon by the party, and (4) the party acted in reliance upon the representation to its damage. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688–89 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). *See also Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex. 1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971); *Schindler v. Austwell Farmers Coop.,* 829 S.W.2d 283, 286 (Tex.App.— Corpus Christi 1992), *aff'd as modified on other grounds,* 841 S.W.2d 853 (Tex.1992).

### C. The Contract—The Joint Operating Agreement.

This case features the 1982 version of the operating agreement form promulgated by the American Association of Petroleum Landmen ("A.A.P.L. Form 610–Model Form Operating Agreement 1982"). The basic and stated purpose of these operating agreements is for the exploration and development of designated oil and gas within the prescribed geographical area described in Exhibit "A" to the J.O.A. A single party is appointed "operator" who is responsible for the management and control of drilling, development, and production activities. The parties agree to share the costs and liabilities, to own equipment, and to share in production in proportion to their respective percentage of ownership and burdens, which is also set out in Exhibit "A" of the J.O.A.

The drilling of an initial well on the contract area is the only operation mandated in which all the parties must participate. After the initial well, any party may propose subsequent drilling operations, but such operations must be conducted by mutual consent of all the parties or pursuant to the consent/non-consent provisions. A.A.P.L. Form 610, 1982, Art. VI, B. Notice of a proposal triggers the consent/non-consent provisions for subsequent drilling operations. Those parties who decline to participate are "non-consenting parties." Those who agree to participate are consenting and bear all costs and risks of that operation. A consenting party may opt to limit its participation to its original working interest or to "carry its proportionate part of Non–Consenting Parties' interests . . . ."

When the operations begin, the non-consenting parties are deemed to have relinquished all interest in the well, operating rights, and production until the carrying parties are reimbursed for 100 percent of what would have been the non-consenting party's share of the operating costs and surface equipment and a substantial risk penalty, a multiple (500 percent in this case) of most other costs carried. A.A.P.L. Form 610, 1982, Art. VI, B(2).

Typically, any party desiring to drill a subsequent well or to rework, deepen, or plug back a nonproducing well is required to give written notice to each participant, specifying the operation proposed, the location, objective depth and formation, and the estimated cost. Upon receipt of the notice, the election to participate must be exercised within a specified period of time. The failure to respond is deemed a negative election. A.A.P.L. Form 610, 1982, Art. VI, B(1).

An election to participate applies to the full extent of a party's interest. However, a party may increase its participation by assuming responsibility for a non-consenting party's interest. If less than all parties elect to participate, the proposing party must inform all the consenting parties of the total

interest committed to the project. Each party that elects to participate may then further elect to limit its participation to its original interest or to carry its proportionate part of the non-consenting parties' interests in addition to its original interest. Despite a non-consenting party's relinquishment of control and share in the subsequent operation, the non-consenting party remains a party in the overall venture and continues to have a substantial degree of control even over the project in which it is not participating. The non-consent party retains the right of access to all portions of the contract area. Most significant to this case, the non-consent party continues to have voting rights in the removal and appointment of the operator, which provides a forum for voicing complaints on the nature of operations for any well in the contract area. Voting rights are undiluted by a non-consent position.

**D. Independent Causes of Action.**

Hunt/Hill contends that Heritage's claims are totally dependent upon the Joint Operating Agreements entered into by the parties for operations in the Crittendon Field. Focusing on the source of duty and the type of damages claimed and proven, Hunt/Hill argues that without the 22 J.O.A. and its attendant relationships, interests, and obligations, no tort obligations rise, and that all of Heritage's claims sound only in contract. They cite *Southwestern Bell Tel. Co. v. De-Lanney*, 809 S.W.2d 493, 495 (Tex.1991), arguing that because the injuries claimed by Heritage are economic losses premised solely upon the subject of the 22 J.O.A., Heritage's action sounds in contract alone. *Id., quoting Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986).

■ The gist of this issue is really that many of the same operative facts that can give rise to a cause of action for breach of contract may also give rise to causes of action for business torts. While the concept that contractual obligations arise from an agreement between the parties whereas a tort obligation is imposed by law separate from any contractual undertaking seems quite evident, application of the concept is not so clear cut. *Compare Airborne Freight*

*Corp., Inc.*, 847 S.W.2d at 295–96, *with Beneficial Personnel Servs. of Texas, Inc. v. Rey*, 927 S.W.2d 157, 167–68 (Tex.App.—El Paso 1996)(vacated pursuant to settlement without reference to the merits). Minimally, any analysis must consider the source of the duty and the nature of the remedy sought to determine the independence of tort claims from their associated contract claims. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 41 Tex. Sup. Ct. J. 289, 291, 960 S.W.2d 41, 43 (Tex.1998). Most significant to this case, however, is that the Texas Supreme Court has clearly recognized the propriety of fraud and tortious interference with contract claims notwithstanding the fact that damages were only economic losses recoverable under a breach of contract claim. *Id.* at 293, at 44 *citing Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992) and *American Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex.1990).

**E. Conclusion.**

■ Thus, the question before us simply comes down to whether Heritage's tort claims are sufficiently independent from the breach of contract claims in the pleadings, in the proof, and in the damages questions submitted to the jury.

The tortious interference and slander of title claims relate to:

- the non-consent interests which Heritage claims it derived from Hunt/Hill's non-participation in the 22–3 well and which Heritage sought to sell to third parties;
- a buy-in agreement that Heritage had with Oxford;
- gas purchase agreements which Heritage sought with Enron and Enserch/Lone Star; and
- a proposal by Sun to buy all of Heritage's interest in the Crittendon Field.

The fraud cause of action depends on the allegation that:

- the Hunts orally promised Heritage that the Hunts would pay for their share of the drilling of the 22–3 well, as well as substitute or subsequent well operations,

in exchange for Heritage putting the 22–2 well into production.

While it is clear that the right to remove an operator under a J.O.A., and participation or non-participation in a subsequent J.O.A. operation are undoubtedly contractual rights, it does not necessarily follow that a party's actions regarding the J.O.A. contract can never rise to the level of a tort. *See American Nat'l Petroleum Co.*, 798 S.W.2d at 278 (breach of one's own contract, while only giving rise to contract claims as regards to that contract, can also constitute claim in tort for tortious interference with the contract of a third party). As noted above, the Texas Supreme Court recently reaffirmed, at least conceptually, that concept, holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa Plastics Corp. USA*, 41 Tex.Sup.Ct.J. at 293, 960 S.W.2d at 44.

Furthermore, we are not dealing with an ordinary contract. Joint Operating Agreements, standardized forms developed over years by the industry to govern ventures in the development of oil and gas properties, are simply not everyday fixtures of life. They govern operations involving immense financial risk and reward; the parties to J.O.A. are experienced and sophisticated and generally have balanced bargaining positions. These are agreements which involve liabilities and obligations unique to the legal and technical peculiarities of the oil and gas industry. Nevertheless, this case highlights that they are still basic structures with minimal safeguards and protections from the misconduct of a party.

We conclude the pleadings and jury submissions sufficiently distinguish independent claims of breach of contract and tort causes of action. The specific facts forming the basis for breach of contract establish at least some degree of independence from the facts forming the basis for the tortious interference, slander of title, and fraud. The tort causes of action pled and proven by Heritage were independent of the 22 J.O.A. Rather,

the contracts or business relationships alleged by Heritage relate to the non-consent interests Heritage sought to sell to third parties, the gas purchase agreements, and Heritage's attempt to sell its entire Crittendon interests which are clearly independent of the obligations and duties imposed under the 22 J.O.A. Consequently, we find that Heritage's recovery in tort is not barred as a matter of law. Points of Error 1a, 5a, 9a, 13a, 17a, 23a, 27a, 31a, 35a, 39a and 53a are overruled.

## IV.

### Non–Consent Interests.

*Points of Error 1b, c, 2a, 4, 22, 23b, c, d, e, f, 24a, and 44.*

We next consider whether there were non-consent interests. Heritage alleged that Hunt/Hill were non-consenting parties to the drilling of the 22–3 well and that they tortiously prevented Heritage from marketing the non-consent interests of Hunt/Hill that Heritage carried in accordance with the 22 J.O.A. Hunt/Hill counter that there were no non-consent interests to be carried by Heritage because the 22 J.O.A. did not cover the 22–3 well. We find that the 22 J.O.A. did not cover the 22–3 well.

### A. Standard of Review.

None of the parties argue that the terms of their joint operating agreement are ambiguous; they simply disagree over the construction and interpretations of its terms. A disagreement over the meaning of a contract does not render the provision ambiguous. *Purvis Oil Corp. v. Hillin and MS Oil Properties, Inc.*, 890 S.W.2d 931, 935 (Tex.App.—El Paso 1994, no writ); *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex.App.—El Paso 1991, no writ). When parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Purvis Oil Corp.*, 890 S.W.2d at 935; *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Where a contract is unambigu-

ous, it need only be enforced as a matter of law and as it is written. *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983); *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518–19 (Tex.1980).

As we discussed before, and as we will discuss several more times, Joint Operating Agreements are familiar, standardized legal documents developed by the oil and gas industry to conduct the complex and risky business of drilling and producing oil and gas. Basic to the purpose of the J.O.A. is the identification of what oil and gas properties are subject to the J.O.A. and what the proportional obligations and interests are borne by the respective working interest owners in the development of those properties, both of which are detailed in Exhibit "A" to the J.O.A. These are essential to a J.O.A. because participation in the first well is the only operation in which all the J.O.A. parties must participate, and thereafter, any J.O.A. party may propose subsequent drilling operations which must be conducted by mutual consent of all the parties or pursuant to the consent/non-consent provisions. A.A.P.L. Form 610, 1982, Art. VI, B.

Heritage claims that it properly proposed the development of the 22–3 well under the terms of the 22 J.O.A., and because Hunt/Hill elected not to participate in the 22–3 well operation, Heritage carried the 22–3 well non-consenting interests of Hunt/Hill. In Question 8 of the trial court's charge, the jury found that the 22–3 well was covered by the 22 J.O.A. It is, however, clear from the record and undisputed that the 22–3 well was proposed, engineered, and drilled to a target depth of 22,000 feet or the Ellenburger formation. Thus, the first problem. with the jury's verdict is that the 22 J.O.A. on its face does not cover the 22–3 well. Exhibit "A" of the 22 J.O.A. reads, in pertinent part:

1. *LANDS SUBJECT TO THIS AGREEMENT:*

 All of Section 22, Block C–23, PSL Survey, Winkler County, Texas

2. *RESTRICTIONS AS TO DEPTHS OR FORMATIONS:*

 To a depth of 20,000' or to a depth sufficient to thoroughly test the Fussel-

man formation, whichever is the lesser depth.

In the face of this contradiction, Heritage makes two alternative arguments. First, that whether or not the J.O.A. covers a well is determined at the time the well is proposed and not after the well has already been drilled. Secondly, the J.O.A. parties modified the depth restrictions of the 22 J.O.A. to cover the deeper depths to which they actually drilled the 22–3 well.

■ We find their first argument that the actual depth or formation to which a well is drilled is immaterial so long as the depth and formation initially proposed were within the "contract area," unpersuasive, either as a general proposition or as applied to this case. The argument is especially flawed as for drilling operations that go beyond or deeper than the limitations defined by the J.O.A. It also trivializes the import of the defined contract area and subjects the non-operators to the whim of the operator. *Cf. Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316, 323–24 (Tex.App.—El Paso 1982, writ ref'd n.r.e.). Conversely, it makes almost no sense to require or to allow an operator to drill deeper than is necessary to bring a well into proper production. In other words, the depth and formation expressed in the J.O.A. define the outer or maximum boundaries covered by a J.O.A. and not minimum mandatory objectives. We therefore reject Heritage's first argument.

■ It is axiomatic that a J.O.A. contract and specifically the contract areas may be contractually amended, and Heritage's alternative argument is that the 22 J.O.A. was modified to authorize drilling the 22–3 well to the actual completion depth of 22,000 feet. To conclude that there was a valid modification, the jury had to favorably determine two elements. The first is that the modification is based upon new consideration. *Hovas v. O'Brien*, 654 S.W.2d 801, 803 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Barnhill v. Moore*, 630 S.W.2d 817, 820 (Tex. App.—Corpus Christi 1982, no writ). The second is that there existed the same degree of mutuality and meeting of the minds as was present for the original contract. *Mid Plains Reeves, Inc. v. Farmland Indus.*,

*Inc.,* 768 S.W.2d 318, 321 (Tex.App.—El Paso 1989, writ denied); *Mandril v. Kasishke,* 620 S.W.2d 238, 244 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). One party alone cannot modify a contract after it has been entered into and all parties to the agreement must assent to the modification for the modification to be valid. *Mandril,* 620 S.W.2d at 244.

The 22 J.O.A. was entered into by sixteen entities, besides Heritage. Accordingly, any modification of the contract would require the mutual assent of all the parties. It is clear from the record that the parties contemplated a modification of the contract area. Indeed, the attempted modification of the 22 J.O.A. contract area did not begin with the 22–3 well, but rather with the 22–2 well. Consequently, we must consider two instances in order to decide if there was, as Heritage argues, a valid modification to the 22 J.O.A. to extend the contract area deeper: (1) the issuance and execution of AFEs on the 22–2 well; and (2) the issuance and execution of AFEs on the 22–3 well.

### 1. The 22–2 Well.

 The undisputed evidence shows that all the working interest owners, except the Hills and Tribal Drilling Company, signed an Ellenburger AFE for the 22–2 well. This contemplated and authorized drilling beyond 20,000 feet and the shallower Fusselman formation. The undisputed evidence shows, however, that the Ellenburger AFE was accompanied by a cover letter from Heritage to the working interest owners that stated, that despite the language in the AFE, Heritage only intended to drill to a depth sufficient to test the Fusselman formation, or to 20,000 feet, whichever was less. Hunt/Hill objected and demanded a Fusselman AFE for the 22–2 well.

Consequently, as a matter of law, a modification of the 22 J.O.A. could not have occurred via the 22–2 well Ellenburger AFE. As evidenced by Heritage's cover letter, there is legally no evidence of a meeting of the minds between Heritage and the other working interest owners. Moreover, there is no evidence of a clear intent on behalf of the parties to modify the J.O.A. Indeed, formal

modification of the 22 J.O.A. was never expressly addressed or requested. Finally, because of the conflicting language of the accompanying cover letter, we do not find any intent by implication that the signing of the Ellenburger AFE by the working interest owners would modify the 22 J.O.A.

The Hunts and Tribal Drilling's refusal to sign an Ellenburger AFE for the 22–2 well, and their demand for and execution of a Fusselman AFE clearly negates any finding of a modification of the 22 J.O.A. because of the 22–2 well operations.

### 2. The 22–3 Well.

 On May 19, 1987, Heritage encountered problems in the drilling of the 22–2 well. Heritage alleged that it halted drilling on the 22–2 well, which was well short of the target depth in exchange for Hunt/Hill's oral promise to pay their share of the costs for a substitute well, the 22–3 well. Both Heritage and Hunt/Hill understood that the 22–3 well was to be drilled to a depth of 22,000 feet, or a depth sufficient to test the Ellenburger formation. No part of that agreement was ever put into writing and no evidence was offered of the essential terms of the agreement. Once it had the oral agreement with Hunt/Hill to stop drilling on the 22–2 well, Heritage polled the other interest owners to secure unanimous consent of all working interest owners to stop short the drilling operations on the 22–2 well.

Heritage then issued three AFEs in series for the 22–3 well. The first AFE issued on June 30, 1987, proposed drilling to a depth of 22,000 feet. The second AFE issued on October 14, 1987, proposed a different location and a depth of 22,000 feet. The third AFE issued on December 1, 1987, proposed the same location as the June AFE but proposed drilling only to a depth of 20,000 feet.

Heritage has not cited, and we have not found any evidence that any one of these AFEs was executed by all the working interest owners. There is evidence that the Hills, in a letter to Heritage, conditionally agreed to the drilling of the 22–3 well to a depth of 22,000 feet upon the occurrence of several conditions, two of which included that Heri-

tage formally amend the 22 J.O.A. to cover the proposed drilling depth and that Heritage secure a title opinion on the drill site in accordance with the 22 J.O.A. The evidence reflects that Heritage tried but failed to secure the other Non–Operators' consent to amend the Section 22 J.O.A. to eliminate the depth restrictions. We simply fail to see how Heritage can now hold Hunt/Hill liable under the unmodified contract. *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992); *Tubb v. Bartlett,* 862 S.W.2d 740, 746 (Tex. App.—El Paso 1993, writ denied).

Heritage has failed to present sufficient evidence of a meeting of the minds of all parties to the Section 22 J.O.A. sufficient to effect a modification. We find that as a matter of law, the Section 22 J.O.A. did not cover the 22–3 well. This finding requires that we sustain Points of Error 22 and 44.

**B. Claims Based on Non–Consent Sales.**

**1. Tortious Interference with a Contract/Prospective Business Relationship.**

■ Because the 22 J.O.A. did not govern the 22–3 well, there was no obligation by any of the working interest owners to make a consent or non-consent election when the 22–3 well was proposed by Heritage. Consequently, there were no non-consent interests in the 22–3 well for Heritage to carry or be able to sell. Nonetheless, the jury found that Heritage had both an agreement to sell the non-consent interest to the five different third parties and a reasonable probability of making such an agreement. These findings are unsupportable.

The cause of action for tortious interference with a contract is qualified with the requirement that the contract be "subject to interference." *Juliette Fowler Homes Inc.,* 793 S.W.2d at 664. All contracts are not subject to interference. There must at least be a "valid" contract. *Id.* Unsupported by any valuable consideration, i.e., the non-consent interests, these contracts were void and not simply unenforceable. *Armendariz v. Mora,* 553 S.W.2d 400, 404–05 (Tex.Civ. App.—El Paso 1977, writ ref'd n.r.e.).

■ Similarly, an element of tortious interference with a prospective business relationship is that there is a reasonable probability of entering into a business relationship. Since Heritage had no non-consent interests to sell, there was "no interest with which [Hunt/Hill] could tortiously interfere." *Grace v. Zimmerman,* 853 S.W.2d 92, 96 (Tex.App.—Houston [14th Dist.] 1993, no writ). With nothing to sale, there could be no actual damages.

■ We also note the general rule that an interfering party is justified in his or her interference if the interference is done in a bona fide exercise of his or her own rights and if he or she has an equal or superior right in the subject matter to that of the other party. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991). Justified action includes the filing of a lawsuit, as long as it is done in good faith with the belief that there is a colorable claim. *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996); *Tidal Western Oil Corp. v. Shackelford,* 297 S.W. 279, 280–81 (Tex.Civ. App.—Fort Worth 1927, writ ref'd). The courts have also recognized the privilege that an interfering party can act to protect its own legitimate financial interest; the invalid selling of non-existing interests pursuant to a joint operating agreement is certainly such an adequate financial interest. *Central Sav. and Loan Ass'n v. Stemmons Northwest Bank,* 848 S.W.2d 232, 241 (Tex.App.—Dallas 1992, no writ). Such justification would apply to both causes of action—actual and prospective agreements.

We thus find that all claims of tortious interference with contract or with prospective business relationships regarding the non-consent interests Heritage claimed to be carrying must fail as a matter of law. Points of Errors 1b, c, 2a, and 4 are sustained.

**2. Slander of Title.**

■ Slander of title is a tort action with stringent pleading and proof requirements. The plaintiff must prove that the defendant made a false and malicious statement, disparaging property in which the plaintiff holds an interest, and causing special damages. *Clark v. Lewis,* 684 S.W.2d 161, 163 (Tex.App.—

Corpus Christi 1984, no writ). A plaintiff must also prove the loss of a specific sale in order to recover. *A.H. Belo Corp. v. Sanders,* 632 S.W.2d 145, 145–46 (Tex.1982).

■ Since there were no non-consent interests for Heritage to carry or sell, Heritage could not possess any interest or estate which could be disparaged; Hunt/Hill's publications or utterances complaining about Heritage's attempts to sell or otherwise market those interests were not false; and finally, it is impossible for Heritage to prove the loss of a specific sale or any special damage. All of Heritage's claims for slander of title premised on the non-consent sales must fail as a matter of law. Heritage is, therefore, precluded from recovery on any theory involving non-consent interests in the transactions involving: (1) Craig Sandahl; (2) Jack Bestrom; (3) Bruce Heafitz; (4) Mobil Producing; and (5) E.R. Duke. We sustain Points of Error 23b, c, d, e, f, and 24a.

## V.

### Statute of Limitations.

*Points of Error 3, 7, 11, 15, 19,*
*25, 29, 33, 37, and 41.*

■ Hunt/Hill challenge the award of damages based on tortious interference with contract and prospective business relations and slander of title on the ground that all such claims were barred by the statutes of limitations. Actions based upon tortious interference with an existing contract, tortious interference with business relations, and slander of title are all controlled by a two-year statute of limitations. TEX.CIV.PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986); *Arabian Shield Dev. Co. v. Hunt,* 808 S.W.2d 577, 584 (Tex.App.—Dallas 1991, writ denied)(tortious interference with existing contract); *Atomic Fuel Extraction Corp. v. Estate of Slick,* 386 S.W.2d 180, 191 (Tex.Civ.App.—San Antonio 1964), *writ ref'd n.r.e. per curiam,* 403 S.W.2d 784 (Tex.1965)(tortious interference with existing contract); *First Nat'l Bank of Eagle Pass v. Levine,* 721 S.W.2d 287, 289 (Tex.1986)(tortious interference with business relations); *Kidd v. Hoggett,* 331 S.W.2d 515, 520 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.)(slander of title).

■ For purposes of applying a statute of limitation to a tort, the cause of action accrues when facts come into existence which authorize a claimant to seek a judicial remedy or when the wrongful act effects an injury. *Hughes v. Mahaney & Higgins,* 821 S.W.2d 154, 156 (Tex.1991); *Brown v. KPMG Peat Marwick,* 856 S.W.2d 742, 746 n. 4 (Tex.App.—El Paso 1993, writ denied). The determination of when a cause of action accrues is a question of law. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988).

■ A cause of action for tortious interference with an existing contract does not accrue until the contract is interfered with and harm caused to the plaintiff. *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967). Similarly, a cause of action for tortious interference with business relations does not accrue until existing negotiations, which are reasonably certain of resulting in a contract, are interfered with such that the negotiations terminate and harm to the plaintiff results. Likewise, a claim for slander of title does not accrue until there has been a loss of a specific sale. *Ellis v. Waldrop,* 656 S.W.2d 902, 904–05 (Tex.1983); *Shell Oil Co., Inc. v. Howth,* 138 Tex. 357, 159 S.W.2d 483, 490 (1942).

■ Until a cause of action accrues, a lawsuit is premature. *Tectonic Realty Inv. Co. v. CNA Lloyd's of Texas Ins. Co.,* 812 S.W.2d 647, 654 (Tex.App.—Dallas 1991, writ denied). If the plaintiff is not yet harmed, even in the face of a breach of duty, then the cause of action has not yet accrued and any suit filed thereupon is premature. *Philips v. Giles,* 620 S.W.2d 750, 751 (Tex.Civ.App.—Dallas 1981, no writ). Moreover, if a claim is not yet ripe, a trial court has no jurisdiction to render an opinion thereon. *City of Garland v. Louton,* 691 S.W.2d 603, 605 (Tex. 1985). To the extent that a plaintiff seeks relief based upon facts that have not yet occurred, there is no live controversy between the parties and a trial court lacks subject matter jurisdiction over such claims. *State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994); *Jones v. Westergren,* 771

S.W.2d 669, 671 (Tex.App.—Corpus Christi 1989, no writ). Consequently, if the trial court lacks subject matter jurisdiction, the appellate court can make no order other than to reverse the case and dismiss. *Gomez,* 891 S.W.2d at 244; *City of Garland,* 691 S.W.2d at 605.

Heritage's Original Petition was filed on December 18, 1987, and joined as defendants, A.G. Hill, Virgil St. Clair, Lyda Hill, Tribal Drilling Company, Stuart Hunt, Sherman Hunt, The Kickham Group, Inc., Hara Hunt, Hilre Hunt, and U.S. Financial Corporation. The original petition alleged various breaches of the J.O.A., interference with actual and prospective business relationships, and cloud of title. The petition contained a brief statement of facts pertaining to Hunt/Hill's challenge of Heritage's status as Operator under the Section 22 J.O.A. and how those actions constituted a breach of the 22 J.O.A. Heritage filed its First Amended Petition on May 1, 1992, adding a number of new plaintiffs and new defendants. At trial in 1992, Heritage presented evidence in support of its claims for tortious interference, slander of title, breach or impaired contract, and lost sales.

In jury Questions 23, 27, 34, and 39, the jury found that Heritage's negotiations with various individuals for the sale of the alleged non-consent interests in the 22–3 well and Heritage's negotiations with Oxford, Sun, Enserch/Lone Star, and Enron did not end before April 30, 1990 (the date two-years prior to the filing of the First Amended Petition), and that Heritage's claims for tortious interference and slander of title based upon the non-consent, Oxford, Sun, Enserch/Lone Star, and Enron transactions were not barred by the statute of limitations period for these causes of action. Hunt/Hill challenge this finding as being legally insufficient as a matter of law and factually insufficient as being against the great weight and preponderance of the evidence.

### A. Standard of Review

When attacking the legal sufficiency of an adverse jury finding to an issue on which the appellant had the burden of proof, the appellant must demonstrate that all vital facts were conclusively established in support of the issue as a matter of law. *Chandler v. Chandler,* 842 S.W.2d 829, 832 (Tex.App.—El Paso 1992, writ denied)(*citing Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 [Tex. 1989] ); *see also Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Montes v. Texas Employers' Ins. Ass'n,* 779 S.W.2d 485, 487 (Tex. App.—El Paso 1989, writ denied). This Court employs a two-prong test when reviewing a "matter of law" challenge on an adverse jury finding. *Chandler,* 842 S.W.2d at 832. First, the record is examined for evidence which supports the finding while ignoring all evidence to the contrary. *Chandler,* 842 S.W.2d at 832; *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696; *Montes,* 779 S.W.2d at 487. If there is no evidence to support the finding, we then examine the whole record to determine if the contrary position is established as a matter of law. *Chandler,* 842 S.W.2d at 832; *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696–97; *Montes,* 779 S.W.2d at 487. Only if the contrary position is conclusively established will the point of error be sustained. *Chandler,* 842 S.W.2d at 832; *Meyerland Community Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

When attacking the factual sufficiency of the failure of the fact finder to find an issue on which the appellant had the burden of proof, it must demonstrate on appeal that the failure to find is so clearly against the great weight and preponderance of the evidence as to be manifestly unjust. This standard requires us to first consider whether there is some evidence that supports the failure to find the issue, and then determine, in light of the entire record, whether the failure to find the issue is manifestly unjust. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence Points of Error",* 38 Texas L.Rev. 361, 364–68 (1960).

### B. Transactions.

### 1. Non-Consent Interests.

██ Hunt/Hill complain that the evidence shows that Heritage did not attempt to sell

the non-consent interests in the 22–3 well until May 1988 and that the efforts to sell those interests had failed by June 1988. Since these claims were not specifically asserted until Heritage filed its First Amended Petition on May 1, 1992, Hunt/Hill argue that they are barred by limitations. We find, however, that Texas Civil Practice & Remedies Code § 16.068 governs the application of the statute of limitations in situations such as this. It provides:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence. TEX.CIV.PRAC. & REM.CODE ANN. § 16.068 (Vernon 1997).

Heritage's original petition complained of the original defendants' conduct in challenging Heritage's working interest in the 22 J.O.A. and sought damages for breach of contract, intentional interference with business relations, and interference with arrangements to promote interests in the 22–3 well. When an amended pleading sets up a new cause of action under Section 16.068, it will relate back to the date of the original pleading for the purposes of limitations, so long as the amended pleading does not allege a wholly new, distinct, or different transaction. *Ex parte Goad*, 690 S.W.2d 894, 896–97 (Tex. 1985); *Duran v. Furr's Supermarkets, Inc.*, 921 S.W.2d 778, 791 (Tex.App.—El Paso 1996, writ denied). The amended claim simply does not allege a wholly new, distinct, or different transaction. Both the earlier and later claims involve the 22 J.O.A. and the parties to that operating agreement. Non-consent interests are an integral feature of Joint Operating Agreements, and critical to this point, they are the core of this litigation.

Consequently, even though Heritage's attempts to sell the non-consent interests may have occurred after the filing of the original petition, the causes of action involving those interests do not arise from a wholly different transaction separate and apart from the originally pled breach of contract action. Heritage's first amended petition relates back to its original petition. Finding some evidence to support the jury's finding that the non-consent transactions were not barred by the statute of limitations, we reject the legal sufficiency complaint. We also find that the great weight of the evidence does not support a finding that the complaint involving non-consent interest is barred by limitations. Accordingly, we overrule both portions of Points of Error 3 and 25.

## 2. Oxford.

Heritage's claim for tortious interference and slander of title in connection with its agreement with Oxford were not specifically pleaded until May 1, 1992. The evidence in the record establishes that the Oxford contract was dated May 10, 1987, but apparently executed in either late September or early October of 1987, prior to Heritage filing suit. Thus, at the time Heritage filed its original petition there appears in the record at least some basis that a ripe claim existed for which it could seek recovery. Heritage's petition, although not specific as to the third party transaction that had failed, did allege causes of action for tortious interference and cloud on title arising from Hunt/Hill's attempts to remove Heritage as Operator. We find that Heritage's original petition was sufficient to vest the trial court with subject matter jurisdiction over the Oxford claim and the First Amended Petition filed on May 1, 1992 relates back to the original petition to preserve the cause of action. Further, Hunt/Hill did not specially except to Heritage's pleading and, therefore, any defect in pleading was waived. TEX.R.CIV.P. 90; TEX.CIV.PRAC. & REM.CODE ANN. § 16.068; *Service Lloyds Ins. Co. v. Slay*, 800 S.W.2d 359, 362 (Tex.App.—El Paso 1990, writ denied).

Though we can find no evidence to support the jury's finding that the Oxford transaction did not terminate before April 30, 1990, that date is not a vital fact because of the foregoing rule of law regarding relation back. We conclude that there is legally and factually sufficient evidence in the record to find that

Heritage's causes of action with respect to the Oxford participation agreement were not barred by the statute of limitations. We therefore overrule both portions of Points of Error 7 and 29.

### 3. Sun, Enserch/Lone Star, and Enron Transactions.

█ The evidence presented at trial with respect to the Sun transaction, the Enserch/Lone Star transaction, and the Enron transaction conclusively established that they did not exist as causes of action at the time of Heritage's filing of its original petition. Instead, the evidence shows that the Sun and Enron transactions came into existence and failed after December 18, 1987. While Heritage entered into negotiations with Enserch/Lone Star as early as September 1987, the evidence also shows that the transaction did not fail until after December 18, 1987. We determine these transactions to be wholly new, distinct, and different transactions from the causes of action pled in the original pleading, and as a result, the amended pleading may not relate back, pursuant to Section 16.068, to the date of the original pleading for the purposes of limitations. *Ex parte Goad*, 690 S.W.2d at 896–97; *Duran*, 921 S.W.2d at 791–92. Therefore, Heritage's claims based upon these transactions were, unlike the nonconsent interests or Oxford, not ripe at the time of Heritage's filing of its original petition and were wholly different from the causes of actions raised in the original petition. Consequently, the trial court could not, as a matter of law, obtain subject matter jurisdiction over these claims and the statute of limitations on these claims could not have been tolled as the claims did not exist. Thus, Heritage's first amended petition must be treated as its original petition for purposes of the subsequently arising causes of action. Under the applicable statute of limitations, Heritage was required to file suit upon these claims within two years of the date that such causes of action accrued, i.e., the date that injury to Heritage resulted.

### a. The Sun Transaction.

█ Heritage has failed to cite to any evidence in the record, and we have found none, which supports the jury finding that the Sun negotiations continued until April 30, 1990. Finding no evidence in the record to support the jury finding, we examined the record to determine if the evidence conclusively established an earlier date for the failure of the Sun transaction and accrual of Heritage's cause of action.

Rick Baldwin, manager of corporate acquisitions in 1988 and 1989, testified that Sun's involvement with Heritage began in 1988. Sun made two offers of contract to purchase Heritage's interests in the Crittendon Field in February 1989 and March 1989. Michael Wisenbaker testified that in December of 1987, there was no pending transaction between Heritage and Sun regarding Heritage's sale of its Crittendon Field interests. Furthermore, Heritage admitted in its brief that the Sun transaction did not exist, either in contract or negotiation, in December of 1987, when Heritage's original petition was filed. The evidence is clear, unequivocal and convincing that Sun terminated its contract with Heritage on March 13, 1989. We, therefore, find that the jury's answer to Question 34 was not supported by legally sufficient evidence and that the evidence conclusively established an earlier date for the accrual of Heritage's cause of action based upon the Sun transaction.

Heritage's causes of action for tortious interference with contractual relations and slander of title as to Sun began to run as of March 13, 1989. Heritage should have filed suit on those causes of action not later than March 14, 1991. The first amended petition was not, however, filed until May 1, 1992. Heritage is, therefore, precluded from recovery on the Sun transaction for tortious interference with contract and slander of title as it failed to timely file suit on those claims.

### b. The Enserch/Lone Star Transaction.

█ Heritage, again, has not cited any evidence in the record and we have not found any evidence which supports the jury finding to Question 39 that the Enserch/Lone Star negotiations continued until April 30, 1990. Finding no evidence in the record to support the jury's finding that the Enserch/Lone Star negotiations continued until April 30, 1990,

we examined the record to determine if the evidence definitively established an earlier date for the failure of the Enserch/Lone Star transaction and accrual of Heritage's cause of action.

Michael Wisenbaker testified that there was no transaction between Heritage and Enserch/Lone Star that could have been interfered with in December of 1987. The evidence presented at trial of negotiations between Heritage and Enserch/Lone Star establishes that the negotiations began in September 1987 and continued until December 1988.

Heritage entered into evidence a November 2, 1988 memo and copies of three contracts and one loan agreement that were to be executed between Heritage and Enserch/Lone Star. In a December 7, 1988 memo, the parties contemplated execution of the contracts within two to four working days. The contracts were never signed, evidencing the failure of negotiations between Heritage and Enserch/Lone Star in December 1988. Heritage's cause of action accrued at that time. The jury's answer to Question 39 was not supported by legally sufficient evidence and we conclude that the evidence conclusively established an earlier date for the failure of the Enserch/Lone Star transaction.

We find the evidence to be clear, unequivocal, and convincing that Heritage's claims for tortious interference and slander of title in the Enserch/Lone Star transaction accrued no later than December 1988. Heritage was required to file suit upon this cause of action not later than January 1, 1991; the First Amended Petition was not filed until May 1, 1992. Therefore, Heritage is precluded from recovery on the Enserch/Lone Star transaction for tortious interference with contract and slander of title as it failed to timely file suit upon these claims.

### c. The Enron Negotiations.

■ Once again, Heritage has not cited any evidence in the record, and we have not found any, which supports the jury finding that the Enron negotiations continued until April 30, 1990. As with the Sun and Enserch/Lone Star transactions, we have examined the record to determine if the evidence conclusively established an earlier date for the failure of the Enron transaction.

Michael Wisenbaker testified that there were no transactions or negotiations with Enron that could have been interfered with in December of 1987. Negotiations between Enron and Heritage began in the summer of 1989. A representative of Enron testified that the last correspondence between the parties occurred in February of 1990. Heritage has also admitted in its pleadings that negotiations between Enron and Heritage were over as of January 10, 1990, and the last correspondence between the two parties was a February 9, 1990 letter from Heritage to Enron. The evidence presented on the issue is clear and unequivocal that negotiations between the parties ended no later than February 9, 1990, the date of the last correspondence. Consequently, Heritage's cause of action for the failed Enron transaction accrued no later than February of 1990 and Heritage was obligated to file suit on this claim certainly no later than March 1, 1992. The First Amended Petition was filed on May 1, 1992. Heritage is, therefore, precluded from recovery for tortious interference and slander of title claims as to Enron as it failed to timely file suit upon these claims.

### d. Application of the Extension Statute.

Heritage nonetheless argues that its original petition filed on December 18, 1987, was broad enough to place in issue all the conduct raised in subsequent pleadings. Heritage's contention is that since the original petition was timely filed, the first amended petition properly relates back to the original petition because the causes of action relate to the same transaction or occurrence. We disagree.

Heritage has cited various cases,[1] including a number we have relied upon, which allow

---

1. *Ex Parte Goad,* 690 S.W.2d 894 (Tex.1985); *Dillard's Depart. Stores, Inc. v. Strom,* 869 S.W.2d 654, 658 (Tex.App.—El Paso 1994, writ dism'd by agr.); *Barrett v. United States Brass Corp.,* 864 S.W.2d 606 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds,* 919 S.W.2d

for the addition of claims or damages sought through post limitation amendments. We find the argument wide of the target. In all cases cited by Heritage there existed, at the time of the original filing, a cause of action upon which the plaintiff could recover, and in each case the amendment only altered the theory of recovery, added an additional claim of relief upon the same facts, changed certain factual assertions, or sought to add to the amount claimed in damages.

▇ The controlling issue is the definition of the term "transaction." Heritage seeks to define the term "transaction" as it is used in Texas Civil Practice and Remedies § 16.068 simply as the wrongful act. However, it is fundamental that torts stem from the consequence of acts, not from the acts themselves. There must be some sort of injury in order for a plaintiff's cause of action to accrue. For slander of title, there must be the loss of a specific sale; for tortious interference with contract, there must be an existing contract and then interference with the contract which results in harm. Without injury there are no damages, and without them both there is no recovery. We, therefore, interpret the term "transaction" as it is used in Section 16.068, as that set of facts which gives rise to the cause of action premised thereon; in other words, as the totality of events which entitle a plaintiff to bring suit.

The case of *Goad* and its progeny provide useful interpretations of the extension statute which support our interpretation. In *Goad*, the Supreme Court explained that if the amended motion "does not allege a *wholly* new, distinct or different transaction, then it relates back to the original filing and is not subject to a limitations defense." *Ex parte Goad*, 690 S.W.2d at 896. In the instant issue, there was no claim or cause of action upon which Heritage could seek recovery at the time of filing its original petition. The evidence is clear that the Sun, Enserch/Lone Star, and Enron transactions all came into existence and failed after the filing of the original petition. Most significant, however, is what they involved. The Sun transaction involved the negotiations for the sale of Heritage's entire interest in the Crittendon Field. While that would have obviously included Heritage's working interest in the 22 J.O.A., it is unrelated to the basic nature of the dispute or to the causes of action originally pleaded. The Enserch/Lone Star and Enron transactions involved gas purchase agreements. The "transaction" upon which Heritage sought recovery in its original petition was clearly a different "transaction" from the "transactions" it sought recovery for in its amended petition. The facts which would give rise to claims as to the Sun, Enserch/Lone Star, and Enron transactions simply did not exist at the time of the filing of the original petition. The causes of action alleged in the first amended petition regarding the Sun, Enserch/Lone Star, and Enron transactions arose from wholly new, distinct, or different transactions than that alleged in the original petition. In either instance, we find that Heritage's claims for tortious interference and slander of title premised upon the Sun, Enserch/Lone Star, and Enron transactions are barred by limitations.

### e. Automatic Stay Due to Bankruptcy.

▇ Heritage lastly argues that its involuntary bankruptcy in late August of 1989 stayed all proceedings against it until it emerged from bankruptcy in January of 1991. Relying on 11 U.S.C.A. § 108 (1993), Heritage asserts that eighteen months must be added to the period in which it had to file its first amended petition. We simply do not read the statute that way. Section 108 provides that the limitations period includes any suspension occurring on or after commencement of the case in bankruptcy. The suspension referred to in Section 108 is that provided for in 11 U.S.C.A. § 362 (1993) which is the automatic stay of all judicial proceedings that were or could have been commenced before the case in bankruptcy *against the debtor.* Section 362 does not apply to actions filed *by the debtor. McMillan v. MBank Fort Worth, N.A.,* 4 F.3d 362, 366 (5th Cir. 1993); *Freeman v. Commissioner of Internal*

---

644 (Tex.1996); *City of Odessa v. Bell,* 787 S.W.2d 525 (Tex.App.—El Paso 1990, no writ); *Kennedy v. Hyde,* 666 S.W.2d 325 (Tex.App.—

Fort Worth), *rev'd on other grounds,* 682 S.W.2d 525 (Tex.1984).

*Revenue,* 799 F.2d 1091, 1092–93 (5th Cir. 1986). We find that Heritage cannot avail itself of the protection afforded by Sections 108 and 362 on claims it initiated.

We sustain both portions of Points of Error 11, 15, 19, 33, 37, and 41.

## VI.

### Legal and Factual Sufficiency of the Evidence.

*Points of Error 1b, c, d, e, 2, 5b, c, 6, 9b, c, d, e, 10, 13b, c, d, e, 14, 17b, c, d, e, 18, 23b, c, d, e, f, 24, 27b, c, d, e, f, 28, 31b, c, d, e, f, 32, 35b, c, d, e, f, 36, 39b, c, d, e, f, 40,and 43b.*

### A. Standard of Review.

Hunt/Hill have challenged the legal and factual sufficiency of the jury findings of tortious interference, slander of title, and fraud. Although we have already determined that the statute of limitations bars many of Heritage's claims, and that there were no non-consent interests in the 22–3 well to be carried by Heritage, in the interest of judicial economy, considering the merits of the principal points of error raised here is appropriate. In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 83 (Tex.App.—El Paso 1992, no writ). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Texas L.Rev. 515 (1991).

A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661; *Worsham Steel Co.,* 831 S.W.2d at 83. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex.App.— El Paso 1981, no writ). It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951); *Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 821 (1947); *Provident Am. Ins. Co. v. Castaneda,* 914 S.W.2d 273, 279 (Tex.App.—El Paso 1996, no writ).

Liability for tortious interference with a contract or business relations and slander of title were found in connection with:

- negotiations for the sale of non-consent interests in the 22–3 well claimed by Heritage;

- letter agreement with Oxford for Oxford to invest 64.5 percent of the drilling costs in exchange for a 33.3 percent working interest in the 22–3 well;

- Heritage's negotiations with Sun for the sale of their entire interest in the Crittendon Field;

- negotiations with Enserch/Lone Star and Enron for gas purchase agreements.

Finally, liability for fraud was found in connection with the alleged oral promise by Hunt/Hill to share in expenses of a substitute or subsequent wells if Heritage ceased drilling on the 22–2 well.

We have concluded, and both sides seem to largely agree, that the foregoing causes of action were premised upon essentially seven distinct acts:

- the negotiations and ultimate agreement between Hunt and Lyco Energy regarding the sale of Hunt's interest in the Crittendon Field, which was contingent on cessation of further drilling operations after the 22–2 well and replacement of Heritage as Operator by Lyco Energy;

- the purported September 28, 1987 removal vote of the Non–Operators to replace Heritage as the J.O.A. Operator;
- the December 10, 1987 removal vote of the Non–Operators conducted by Hunt/Hill to remove Heritage as the Operator on the basis that Heritage lacked a proper ownership interest in the 22 J.O.A.;
- Hill's letter of December 1987 that stated that Heritage had no interest in the 22 J.O.A.;
- Hill's attorney's letter of December 18, 1987 which stated that Heritage was at best a co-tenant in the 22–3 well or worst a "bad faith trespasser;"
- the declaratory litigation initiated by Hunt/Hill against Heritage in Dallas County; and
- the Hunt's oral agreement with Heritage to participate in the 22–3 well in exchange for Heritage stopping and completing the 22–2 well short of the objective depth and formation.

The jury concluded that the consequences of these acts were:

- that Heritage's title in the 21 and 22 J.O.A.s was slandered;
- that Heritage's agreements to sell to third parties the non-consent interests which Heritage carried in the 22–3 well were tortiously interfered with;
- that the participation agreement that Heritage had with Oxford was tortiously interfered with;
- that the agreement Heritage had with Sun for the sale of all Heritage's interest in the Crittendon Field was tortiously interfered with;
- that Heritage's prospective business relationship with Enserch/Lone Star and Enron oil companies was tortiously interfered with; and
- that the Hunt's promise and failure to pay their share of costs of the 22–3 well constituted a fraud against Heritage.

**B. Tortious Interference with a Contract or Prospective Business Relationship.**

Texas law protects existing and prospective contracts from interference. *Juliette Fowler Homes, Inc.*, 793 S.W.2d at 665. The principal difference between the two involves the requirement of a contract as opposed to a potential for a contract and the question of justification or defense which is borne by the defendant in a tortious interference with contract case. The elements are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was the proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *Holloway*, 898 S.W.2d at 795–96; *Armendariz*, 553 S.W.2d at 404. Like all business torts, these elements may seem simple but there are numerous exceptions.

The first requirement is essentially a qualification that there must be a "contract subject to interference." All contracts are not subject to interference. There must be a valid contract. *Juliette Fowler Homes, Inc.*, 793 S.W.2d at 665. The second requirement concerning "willful and intentional" is dependent upon a strict requirement of adequate proof to demonstrate this requirement. There must be some direct evidence of a willful act of interference. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex.1993). The interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed. *Armendariz*, 553 S.W.2d at 406. The interference must proximately cause damage or harm. *State Nat'l Bank of El Paso*, 678 S.W.2d at 689. The measure of damages for tortious interference is the same for breach of contract; the plaintiff is to be put in the same economic position as if the contract had not been breached. *Armendariz*, 553 S.W.2d at 406.

Generally, the interfering party is justified in interfering if the actions are done in a bona fide exercise of the party's own rights or if the party has an equal or superior right in the subject matter. *Victoria Bank & Trust v. Brady*, 811 S.W.2d 931, 939 (Tex.1991). Justification may include the right to file a lawsuit provided this is done in good faith with the belief that there is a colorable claim. *Texas Beef Cattle Co.*, 921

S.W.2d at 211; *Tidal Western Oil Corp.*, 297 S.W. at 281. An interfering party is privileged to protect its own legitimate financial interest. *Central Sav. and Loan Ass'n*, 848 S.W.2d at 241.

In an action concerning a prospective business relationship, the elements are: (1) the reasonable probability that a contractual relationship would have been entered; (2) an intentional, malicious intervention with the formation of that relationship; (3) without privilege or justification; (4) resulting in actual damage or loss. *Gonzalez*, 905 S.W.2d at 421. It is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied). More than mere negotiations must have taken place. *Caller–Times Publ'g Co. v. Triad Communications, Inc.*, 855 S.W.2d 18, 24 (Tex.App.—Corpus Christi 1993, no writ); *Grace*, 853 S.W.2d at 96. The act of interference must be purposefully done with the intent to harm the plaintiff.

The plaintiff has the burden of proving lack of justification or excuse in a tortious interference with prospective business relationship cause of action. *Tarleton State Univ. v. Rosiere*, 867 S.W.2d 948, 952 (Tex.App.—Eastland 1993, writ dism'd by agr.). However, other than the difference in burden of proof, justification involves the same type of proof as in a tortious interference with contract. A superior financial interest, for example, is recognized as justification or excuse. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 566 (Tex.App.—Dallas 1989, no writ). Lastly, it must be demonstrated that the plaintiff suffered some actual damage or harm. The measure of such damages is, however, different from tortious interference with contract as the damages are not strictly based upon contract rules. *Allsup*, 808 S.W.2d at 660.

## 1. Non–Consent Interests.

Heritage claims that the development of the 22–3 well was properly proposed under the terms of the 22 J.O.A., that Hunt/Hill elected not to participate in the operation, and that Heritage carried the non-consenting interests of Hunt/Hill. The jury found that Heritage had both an agreement and a reasonable probability of making such an agreement to sell the non-consent interests that it claimed it carried in the 22–3 well to Craig Sandahl, Bruce Heafitz, Jack Bestrom, Mobil Producing Texas and New Mexico, and E.R. Duke.

Because there were no non-consent interests created in the 22–3 well, any contracts or probability of entering into such contracts were void and not subject to interference. We find from the record before us that not only is there a complete absence of evidence to support the vital fact that there were non-consent interests in the 22–3 well, but that the evidence conclusively establishes the opposite of that fact. Consequently, the first element of tortious interference with a contract or prospective business relationship could not be legally or factually proven. We do find, however, that considering only the evidence and inferences which support the remainder of the jury's findings, the remaining elements of willful and intentional acts, proximate cause of damage, and actual damage or loss was legally and factually sufficient. *See Holloway*, 898 S.W.2d at 795–96; *Juliette Fowler Homes, Inc.*, 793 S.W.2d at 665; *Armendariz*, 553 S.W.2d at 404. There is clear, probative evidence that Hunt/Hill were aware and had actual knowledge of Heritage's attempts to market the claimed non-consent interests and sufficient evidence for a reasonable person to conclude Hunt/Hill's actions protesting Heritage's claim were actionable acts of interference which was the proximate cause of damages suffered by Heritage. *See State Nat'l Bank of El Paso*, 678 S.W.2d at 691. We finally note that the measure of damages for tortious interference with contract is the same as for breach of contract, that objective being to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz*, 553 S.W.2d at 404. Loss of the benefit of the bargain damages are also recoverable under a fraud cause of action. *Peco Const. Co. v. Guajardo*, 919 S.W.2d 736, 738–39 (Tex.App.—San

Antonio 1996, writ denied), *citing W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128 (Tex.1988). We find the jury's award of 7.9 million dollars to be legally sufficient as there is some evidence that the amount awarded was a reasonable measure of actual damage suffered as a result of the loss of the non-consent sales, and factually sufficient because the evidence was not clearly against the great weight and preponderance of the evidence to be manifestly unjust. As a result, if there had been non-consent interests to market, we would have sustained Points of Error 1b, c, and overruled Points of Error 1d, e, and 2a. We need not address Point of Error 2b.

## 2. Oxford.

Hunt/Hill complain that there is no or insufficient evidence to support the jury's finding of tortious interference with the participation agreement Heritage had with Oxford. Oxford entered a letter agreement dated May 10, 1987 with Heritage for Oxford to participate in the 22–3 well. Oxford agreed to bear 64.5 percent of all drilling and testing costs and 58.3 percent of the casing costs at completion in exchange for the assignment of an undivided working interest of 33.33 percent in the 22–3 well. Jerry Anderson, the president of Oxford, testified that Oxford received letters in March 1988 from attorneys representing Hunt/Hill asserting that Hunt/Hill were not non-consenting and that their interests were not subject to being carried. He further testified that in August 1988, Oxford, which to that point had paid approximately four million dollars, decided to take a proportional reduction in the working interest to be earned and ceased making payments to Heritage.

◼ Considering only the evidence and reasonable inferences that tend to support the finding and ignoring all evidence and inferences contrary to the jury's findings, we must conclude that there is at least some evidence of probative force to support the finding. It is clear from the record and uncontested that there was a valid and enforceable contract between Oxford and Heritage. There is also direct evidence of actions by Hunt/Hill which establish evidence of acts of interference. What Hunt/Hill do contest is whether there is any evidence or sufficient evidence to establish the element of willful intent and actual damages. We conclude that there was legally and factually sufficient proof for the jury to conclude that the act of interference by Hunt/Hill was the proximate cause of the damages suffered. Though Oxford's president testified that the reason for stopping payments on the participation agreement with Heritage was that of concerns that Heritage was diverting Oxford's investment to other wells and uncertainty and lack of information about operations at the 22–3 well, his testimony was contradicted, his credibility strongly challenged, and in particular, his subsequent cooperation with Hunt/Hill could reasonably be considered suspect. Simply stated, the evidence in this record furnishes some reasonable basis for differing conclusions by reasonable minds as to the existence of the essential facts. Moreover, in a no evidence challenge, the appellate court may not substitute its view of the credibility of witnesses for that of the jury. *Benoit,* 239 S.W.2d at 797. We may not substitute our view of the credibility of witnesses for that of the jury in a no evidence challenge, and as a result, that challenge here must fail. In light of all the evidence, we are also unable to find the jury's verdict to be clearly wrong and manifestly unjust, so that there is factually sufficient evidence to support the jury's finding that Hunt/Hill's acts of interference willful and knowing and proximately caused actual damage to Heritage.

◼ The jury awarded 3.16 million dollars in actual damages for the tortious interference with the Oxford contract. Though we are unable, from the record before us, to understand exactly what interest in the 22–3 well that Oxford had bargained for, it is clear from the testimony elicited by all sides that Heritage's claimed non-consent interests formed at least part of the undivided interest to be earned by Oxford. Given the evidence that Oxford had contributed approximately four million dollars before it ceased participating and evidence of the total drilling and production costs of the 22–3 well, the jury's award for actual damages was both legally

and factually sufficient. We, therefore, overrule Points of Error 5b, c, and 6a.

### 3. Sun.

This transaction involved Sun negotiations to acquire all interests in the Crittendon Field. We have found that Heritage's cause of action related to this transaction, and also the next two, Enserch/Lone Star and Enron, are barred by the statute of limitations. We will, however, at least briefly, address the merits of the points of error raised as a matter of judicial prudence.

Hunt/Hill challenge the legal and factual sufficiency of the evidence to support the jury finding that they tortiously interfered with the Sun contract or probable contract to purchase all of Heritage's interest in the Crittendon Field and the resulting jury award of more than $27.5 million. Beginning sometime in 1988 and culminating in the first quarter of 1989, Sun began negotiations to acquire the Crittendon Field oil and gas interests which included the 21 and 22 J.O.A. interests. Sun made two offers to Heritage and Heritage verbally accepted the second offer made on March 9, 1989. At approximately the same time, Sun also offered to purchase the interests of Hunt/Hill, and was aware of pending litigation between Heritage and Hunt/Hill. On March 13, 1989, Heritage advised Sun that the 22–2 well had begun producing water and Sun withdrew its offer of purchase.

Hunt/Hill have separately challenged the legal and factual sufficiency of evidence necessary to prove every element of tortious interference, those being: (1) a contract subject to interference or a probable business relationship; (2) knowledge of the contract or proposed contract and intent to interfere; (3) proximate cause; and (4) actual damages. We conclude that the only issues which merit discussion are whether there was a contract subject to interference and proximate cause as we find that the record establishes both legally and factually sufficient evidence to support the jury's favorable findings of the other required elements and damages.

 It is clear and uncontradicted that at the same time Sun was negotiating with Heritage, it was also negotiating with Hunt/Hill. Indeed, it is evident that Sun was only interested in the acquisition of all working interests in the Crittendon Field. Hunt/Hill argue that because Sun was negotiating with both sides here that as a matter of law, Hunt/Hill could not interfere with their own contract with Sun. We agree. Whatever the claimed actions of Hunt/Hill were or might have been, and notwithstanding the fact that Sun would have to acquire by separate contracts all various working interests necessary to acquire the entire interest, because the financial interests of Heritage and Hunt/Hill were identical with respect to their business relationship to Sun, there can be no liability for the actions of Hunt/Hill. A party to a business relation cannot tortiously interfere with itself. *Coastal Corp. v. Atlantic Richfield Co.*, 852 S.W.2d 714, 720 (Tex.App.—Corpus Christi, 1993, no writ).

 Finally, we are unable to find any evidence of proximate causation. It is clear that Sun withdrew its offer to purchase interests in the Crittendon Field because the 22–2 well had begun to water. We understand Heritage's argument to be that the reason why the business relationship was terminated is not the issue, but rather delaying or hindering the negotiations. In other words, Hunt/Hill prevented the sale of Crittendon Field before the 22–2 well watered out. A plaintiff must be able to show that the act of interference was the proximate cause of the damages suffered by it. This is the classic proximate cause test with the component elements of cause in fact and foreseeability. *State Nat'l Bank of El Paso*, 678 S.W.2d at 691. We find that evidence is legally insufficient to support a finding that Hunt/Hill's actions, if any, were the proximate cause of any damages suffered by Heritage.

We overrule Points of Error 9d and 10a, and sustain Points of Error 9b, c, and e. We need not address Point of Error 10b.

### 4. Enserch/Lone Star and Enron.

 We consider the last two transactions upon which Heritage recovered for tortious interference together. Heritage sought to obtain a prepayment gas contract with Enserch/Lone Star. Heritage also negotiated

without success with Enron for a gas purchase agreement. The jury found that Hunt/Hill tortiously interfered with those negotiations in each situation and awarded Heritage damages more than $23.2 million in connection with Enserch/Lone Star and $4.5 million on account of Enron. Hunt/Hill have challenged the legal and factual sufficiency of evidence with respect to all of the elements necessary under each claim of tortious interference. Recalling that we have held that Heritage's causes of action regarding this transaction are barred by the statute of limitations, we have nonetheless considered the merits of Hunt/Hill's points of error regarding the sufficiency of evidence. With regard to the "no evidence" points, considering only the evidence and reasonable inferences that tend to support the findings and ignoring all contrary evidence and inferences, we find that there is some evidence to support those findings. There was testimony and documentary evidence of negotiations which a reasonable person might conclude would result in a contractual business relationship. There was at least some evidence that Hunt/Hill had knowledge of the negotiations, that there was an intent on the part of Hunt/Hill to interfere with those negotiations, and that Hunt/Hill's actions were the proximate cause of the damages suffered by Heritage. As for the damages awarded, there is some evidence in the form of Michael Wisenbaker's testimony and various pricing and cost documents in the record.

Considering Hunt/Hill's challenge to the factual sufficiency, we have likewise concluded that after examination of all the evidence, that we are unable to say that the evidence is so weak as to be clearly wrong and manifestly unjust. Though our own view of the evidence is different, we will not substitute our view for that of the jury where much of this case weighed upon the credibility of the principal witnesses on each side, moreover, we are mindful that a preponderance of the evidence unanimously convinced the jury in this case. We overrule Points of Error 13b, c, d, e, 14a, 17b, c, d, e, and 18a. We need not address Points of Error 14b and 18b.

### C. Slander of Title.

The issues involved in these series of points involve Heritage's position as the Operator under the 22 J.O.A., that is, whether Heritage had the requisite interest to hold that position. Heritage's claims arise from utterances and publishing challenges to Heritage's interest in the 22 J.O.A., that Heritage had been removed as Operator, that Heritage was a bad faith trespasser, and illegally drilled the 22–3 well. The jury found that Hunt/Hill slandered Heritage's title to Sections 21 and 22, and awarded actual damages of approximately $7.988 million with respect to the non-consent sales and $3.1 million with respect to the Oxford agreement. The jury found zero damages with respect to Sun, Enserch/Lone Star, and Enron transactions; however, the trial court disregarded the jury's verdict and awarded the same, respective damages as were awarded under the tortious interference claims.

 To prove slander of title, Heritage was required to show that Hunt/Hill published false statements maliciously, and these statements caused special damages to Heritage's interest in land. "Malice," for purposes of this tort, is defined as making false statements regarding title in absence of color of title or a reasonable belief that parties have title. *Santa Fe Energy Operating Partners v. Carrillo*, 948 S.W.2d 780, 785 (Tex.App.—San Antonio 1997, n.w.h.); *Storm Assoc.'s, Inc. v. Texaco, Inc.*, 645 S.W.2d 579, 588–89 (Tex.App.—San Antonio 1982), *aff'd sub nom., Friedman v. Texaco, Inc.*, 691 S.W.2d 586 (Tex.1985).

### 1. Non–Consent Interests.

 Heritage's claim of slander of title and the award of damages with respect to the non-consent interests fails as a matter of law because there were no non-consent interests to be sold. A plaintiff seeking to recover damages in a slander of title action must prove the loss of a specific sale in order to recover. *A.H. Belo Corp. v. Sanders*, 632 S.W.2d 145, 146 (Tex.1982). Though the title or interest claimed to have been maliciously disparaged is evidently distinct from the issue of whether or not there were non-consent interest carried by Heritage, the fact re-

mains that Heritage had no non-consent interests to sell. Thus, we find that the evidence in the record conclusively establishes the opposite of a vital fact and Hunt/Hill's no evidence challenge must be sustained with respect to the non-consent interests. Points of Error 23b, c, d, e, f, and 24a are again sustained; we need not address Point of Error 24b.

## 2. Oxford.

 As we have stated before, it is unclear what interests Oxford expected to earn in return for its participation in the 22–3 well. Certainly, there is some evidence that Oxford expected that it was indeed earning some of the non-consent interests which it understood that Heritage was carrying. However, the evidence is not conclusive that those interests were the exclusive consideration for Oxford's participation agreement. As a consequence, we are unable to say that there is either a complete absence of evidence or that the evidence supporting the jury's finding is so weak as to be clearly wrong and manifestly unjust.

 We also find it clear from the record that the identical awards for both tortious interference and slander of title for the same transactions are duplicative as a matter of law. Texas law does not permit double recovery. *Southern County Mut. Ins. Co. v. First Bank and Trust of Groves*, 750 S.W.2d 170, 173–74 (Tex.1988). When the prevailing party fails to elect between alternative measures of damages, the court should render the judgment affording the greatest recovery. *See, e.g., Kish v. Van Note*, 692 S.W.2d 463, 468–69 (Tex.1985)(rendering judgment for each separate element of damages in order to give the plaintiffs complete compensation for their losses). Points of Error 27b, c, d, e, f, and 28a are overruled. We sustain Point of Error 28b, and dismiss Point of Error 6b as moot.

## 3. Sun, Enserch/Lone Star, and Enron.

We have earlier concluded that these claims are barred by the statute of limitations. As a result it is not necessary to reach the merits of the sufficiency points raised. We do note, however, that it appears clear

from the record before us that the identical awards for both tortious interference and slander of title for the same transactions are duplicative as a matter of law. As we noted above, Texas law does not permit double recovery. *Southern County Mut. Ins. Co.*, 750 S.W.2d at 173–74. Points of Error 32b, 36b, 40b, and 43b are sustained; it is unnecessary to consider Points of Error 31b, c, d, e, f, 32a, c, 35b, c, d, e, f, 36a, c, 39b, c, d, e, f, 40a, and c.

### VII.

**Were Hunt/Hill "justified" in their actions for which they might otherwise be liable for tortious interference or slander of title?**

*Points of Error 8, 12, 16, 20, 26, 30, 34, 38, 42.*

## A. Standard of Review.

The jury found in each instance submitted that Hunt/Hill were not justified in their actions in connection with each alleged instance of tortious interference and slander of title.

 The jury was instructed that:

You are instructed that the conduct of the Defendants was justified or excused if (1) it was done in the good faith exercise of their own rights, or (2) if they had equal or superior rights in the subject matter of the potential transactions to that of Heritage. One is justified in asserting a claim, even if the validity of that claim is doubtful, so long as it is possible that the claim may have merit.

Hunt/Hill have challenged each of these adverse findings as being legally and factually insufficient. Their challenges have been framed as if Hunt/Hill had the burden of proof, i.e. "as a matter of law" and "against the great weight and preponderance" even though, as earlier discussed, they had the burden of proof only with respect to the tortious interference claims. A legal sufficiency challenge of "as a matter of law" applies when the challenging party has the burden of proof. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). We

must first examine the record for evidence that supports the adverse finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the failure to find, then we examine the entire record to determine whether the proposition is established as a matter of law. The challenger must then demonstrate that the evidence conclusively establishes all vital facts in support of the issue as a matter of law. *Worsham Steel Co.*, 831 S.W.2d at 81. A factual sufficiency point requires examination of all the evidence in determining whether the adverse finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d at 661.

**B. Justification.**

 The general rule is that a party's interference is justified if the interference with the contractual relations of another is done in a bona fide exercise of its own rights, or if the actor has an equal or superior right in the subject matter to that of the other party. *Victoria Bank & Trust Co.*, 811 S.W.2d at 939. In a tortious interference with a contract case, the privilege of justification or excuse is an affirmative defense on which the defendant has the burden of proof. *Sterner*, 767 S.W.2d at 691. In a tortious interference with prospective business relationship case privilege or justification is an element of the action; hence, the burden of pleading and proof is on the plaintiff. *Tarleton State Univ.*, 867 S.W.2d at 952.

 Factors to be considered in determining whether a privilege exists include: (1) the nature of the conduct; (2) the interests of the injured party; (3) the actor's motive; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity of the actor's conduct to the interference; and (7) the relations between the parties. *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex.App.—El Paso 1988, writ denied). Justification includes the filing of a lawsuit, so long as it is done in good faith with the belief that there is a colorable claim. *Texas Beef Cattle Co.*, 921 S.W.2d at 211; *Tidal Western Oil Corp.*, 297

S.W. at 281. It may also cover the actions of the interfering party to protect its own legitimate financial interests. *Central Sav. and Loan Ass'n*, 848 S.W.2d at 241. A superior financial interest is recognized as justification or excuse. *Gillum*, 778 S.W.2d at 566. Apart from the difference in burden, the justification or excuse, in either of the foregoing actions, involves the same type of proof and the question is one for the jury. *Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex.1992).

 In an action for slander of title, the party must allege and prove, *inter alia*, the utterings and publishing of disparaging words; however, communications in the due course of a judicial proceeding may not serve as the basis of a civil action for slander of title, and consequently, constitutes a privilege of justification or excuse. *See Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942); *James v. Brown*, 637 S.W.2d 914, 916 (Tex.1982). This privilege encompasses all aspects of the judicial proceedings including statements made in open court, depositions, affidavits and pleadings, and papers of the case. *Id.* at 916–17.

**C. Application to facts.**

**1. Non–Consent Interests.**

 As we have determined that there were no non-consent interests to be carried by Heritage, it necessarily follows that Hunt/Hill had a superior right in the subject matter to that of Heritage and that its interference with either the contractual or prospective business relations regarding the non-consent interest was justified as a bona fide exercise of their own rights. *Victoria Bank & Trust Co.*, 811 S.W.2d at 939. In a slander of title action, however, and unlike tortious interference, the only privilege accorded defamatory remarks are for those remarks published as a part of judicial proceedings. *James*, 637 S.W.2d at 916–17. Hunt/Hill nevertheless argue that because all communications regarding the non-consent interest were uttered or published after both their own lawsuit in Dallas County and this suit in Winkler that all communications are protected under the judicial proceedings

privilege. We conclude, however, that there is some evidence that Hunt/Hill's communications were neither preliminary to nor in contemplation of any judicial proceeding, and their utterance or publication, even though after the institution of the law suits, is not absolutely privileged. We accordingly overrule both portions of Point of Error 26.

### 2. Oxford.

■ As was noted earlier, it is not entirely clear from the record exactly what working interests in the 22–3 well Oxford sought to acquire as consideration for its participation agreement with Heritage. From the testimony of Oxford's president, Jerry Anderson, and the questions presented to him by all sides, it does seem clear that Oxford thought it was participating to gain the non-consent interests that Heritage maintained it was carrying, but we also find it evident that more than just non-consent interests were involved. As a consequence, we cannot say, as we did above, that there is no evidence in the record to conclusively establish that Hunt/Hill were justified or excused in their interference, nor do we find that the great weight of the evidence in favor of justification to be so contrary to the jury's adverse finding on the issue as to be manifestly unjust.

Finally, we have also found sufficient evidence in the record of utterances and publications that were outside and beyond the protection and privilege accorded judicial proceedings. Accordingly, we overrule Points of Error 8 and 30.

### 3. Sun, Enserch/Lone Star, and Enron.

■ Considering the same factors as this Court did in *Maynard,* 752 S.W.2d at 721, and comparing those factors to the record before us, we are unable to find that the evidence with regard to the Sun, Enserch/Lone Star, and Enron transactions was either legally or factually insufficient. The same result is reached whether the burden of establishing a privilege is on Hunt/Hill or Heritage. Hunt/Hill's principal argument relies upon the absolute privilege accorded judicial proceedings; however, there are pleadings and evidence of probative force in the

record which we find to be neither preliminary to nor in contemplation of a judicial proceeding. As a result, Hunt/Hill's no evidence and insufficient evidence challenges, as to the tortious interference and slander of title actions involving the Sun, Enserch/Lone Star, and Enron transactions must fail. We overrule Points of Error 12, 16, 20, 34, 38, and 42.

### VIII.

### Fraud.

*Points of Error 53.*

Heritage brought a cause of action for fraud in connection with the representation of the Hunt brothers and Virgil St. Clair to Michael Wisenbaker that they would participate in the drilling of a substitute well, the 22–3 well, if Heritage ceased drilling on the 22–2 well, short of its target depth or formation. The jury agreed. Hunt/Hill's complaint here is three-fold: first, that the claim sounds in contract, not tort; second, that any recovery for fraud is waived by the failure of Heritage to obtain a finding of damages for fraud; and thirdly, that there is no evidence or insufficient evidence to support a finding of fraud.

■ We have already rejected the argument that Heritage's claims sound only in contract, not tort. Indeed, the claim here is precisely the situation where a party's actions regarding a contract may rise to the level of a tort. *See American Nat'l Petroleum Co.,* 798 S.W.2d at 278. Every contract, including J.O.A.s, carries the common law duty to perform the agreed tasks with care, skill, reasonable expedience, and faithfulness so that a breach thereof constitutes a tort as well as a breach of contract. *Montgomery Ward & Co.,* 204 S.W.2d at 510. As we earlier noted, the Texas Supreme Court reaffirmed that concept, holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa*

*Plastics Corp. USA,* 41 Tex.Sup.Ct.J. at 293, 960 S.W.2d at 44.

■ The jury was first asked, in Question 8, to decide whether the 22–3 well was covered by the 22 J.O.A.; an affirmative answer then required them to decide in Question 11 that Hunt/Hill's failure to comply with the 22 J.O.A. was not excused. Question 12 then asked if Hunt/Hill agreed to participate in the 22–3 well in exchange for Heritage's stopping drilling of the 22–2 well. Again the jury responded affirmatively, requiring them to answer Question 13, which was whether those actions constituted a fraud on Heritage, and again, the jury said "yes." Conditioned upon an affirmative finding in Question 12, the jury was then asked, in Question 14, to assess damages for Hunt/Hill's "failure to pay their shares of the 22–3 well costs." Hunt/Hill now contend that no damages question was submitted in connection with the fraud found; hence, any recovery for fraud was waived. We do not construe the jury findings so narrow as to find that Heritage is precluded from any recovery for fraud. Though the question of damages was predicated upon an affirmative answer to the action described in Question 12, which the jury found to constitute fraud in Question 13, we conclude that there was a proper finding of actual tort damages by the jury.

The last remaining issue is whether there was legally or factually sufficient evidence to support the finding of fraud. In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza,* 395 S.W.2d at 823; *Worsham Steel Co.,* 831 S.W.2d at 83. If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate,* 244 S.W.2d at 661–62; *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Texas L.Rev. 515 (1991). A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 661; *Worsham Steel Co.,*

831 S.W.2d at 81. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco,* 623 S.W.2d at 772.

■ The elements of common law fraud have long been recognized in Texas as:
- that a material representation was made;
- that it was false;
- that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion;
- that he made it with the intention that it should be acted upon by the party;
- that the party acted in reliance upon it; and
- that the party thereby suffered injury.

*State Nat'l Bank of El Paso,* 678 S.W.2d at 681. Another key factor is whether the Hunt/Hill's promise to participate in the 22–3 well is actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. *Spoljaric,* 708 S.W.2d at 434.

■ We first note that the 22 J.O.A. unambiguously provides circumstances in which a well can be stopped short of its contract depth: (1) if further drilling is rendered impractical by granite or any other impenetrable substance or condition in the hole; or (2) if all parties agree to complete or abandon the well at a lesser depth. It also, as previously discussed, specifically delineates the procedures to follow for proposing a new well. Once a new well is proposed in writing, a party to the J.O.A. can then elect to take a consent position which then results in the obligation to pay the new well costs. But notwithstanding the contractual rights to consent or not consent to the stopping of the 22–2 well, and subsequently, the right to consent or not consent to participate in the 22–3 well, we find that the record amply supports a jury finding of an independent tort. It is clear from the record the Hunt/Hill wanted drilling on the 22–2 well stopped because of negotiations for the sale of their interest in the Crittendon Field. That, however, required unanimity by all working in-

terest owners under the terms of the J.O.A. There is also ample probative evidence for the jury to conclude that Hunt/Hill never intended to consent to a subsequent drilling operation which they were obligated to do under the terms of the J.O.A., or take a non-consent interest. The critical focus being whether there is sufficient evidence for a rational jury to find that Hunt/Hill's promise to participate in the 22–3 well is actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. *Spoljaric,* 708 S.W.2d at 434. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Id.* Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.* at 435. Slight circumstantial evidence of fraud, when considered with the breach of a promise to perform, is sufficient proof to support a finding of fraudulent intent. *Id.* The record contains sufficient evidence from which a reasonable jury could have inferred fraudulent intent. One example of this evidence is the transcript of the conversation between the Hunt brothers and Michael Wisenbaker that took place on September 25, 1987. Unbeknownst to Wisenbaker, the Hunts secretly recorded the conversation in which they told Wisenbaker: (1) that they were not contemplating the sale of their interests in the field, even though they had already initiated negotiations with Lyco Energy Corp; (2) that they wanted Wisenbaker to cease all drilling operations in Section 22, though for obvious reasons, they did not disclose to Wisenbaker that this was a condition precedent to the sale of their interests to Lyco Energy Corp; (3) that they had the requisite votes to remove Heritage as Operator, another misrepresentation; and (4) that they would remove Heritage as Operator if Heritage did not immediately cease all drilling operations in Section 22, notwithstanding their agreement to participate in the 22–3 well as a substitute well. Another example of this evidence is Virgil St. Clair's assertion that the 22–2 well had reached a depth sufficient to test the Fusselman formation when he was fully aware that the 22–2 well had not penetrated

the Fusselman formation. Other examples of evidence supporting the jury's finding of fraudulent intent are the Hunt brothers' denials at trial. At trial, both Hunt brothers denied that they had promised to participate in the 22–3 well once Heritage agreed to stop drilling the 22–2 well. Ample evidence was produced to the contrary. A party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise. *Spoljaric,* 708 S.W.2d at 435. We conclude that there was sufficient evidence for a rational jury to find that Hunt/Hill's promise to participate in the 22–3 well was actionable because at the time the promise was made Hunt/Hill made it with the intent not to perform the promise. We also note that Hunt/Hill have never seriously disputed the factual sufficiency of the allegation and only tried to classify it as being legally insufficient as a claim sounding only in contract, not tort. Consequently, we overrule Point of Error 53.

## IX.

### Breach of Oral Contract to participate in the 22–3 well.

#### *Point of Error 54 and 55.*

The jury, in response to Questions 12 and 14, found that Hunt/Hill had breached an oral agreement with Heritage to pay their share of the 22–3 well costs and awarded Heritage $6,343,532.71 in damages. Specifically, Question 12 asked if any of the Defendants or their agents, "agree to pay their share of the 22–3 well costs in May, 1987 in exchange for Heritage's stopping the drilling of the 22–2 well?" Since the jury answered Question 12 in the affirmative, they proceeded to answer Question 14 awarding Heritage damages for the defendants' failure to pay their share of the 22–3 well costs. Hunt/Hill challenge this recovery on legal and factual sufficiency grounds and on the theory of Statute of Frauds.

#### A. Standard of Review

Neither of the parties argue that the terms of the J.O.A. are ambiguous, they merely disagree as to the form of consent necessary under the J.O.A. to accept the proposal of a

new well. Hunt/Hill argue that the J.O.A. is subject to the Statute of Frauds because it involves contracts for the sale of real estate. Heritage contends that the ultimate question regarding this issue is whether Hunt/Hill consented to participate in the 22–3 well. In arguing this point, Heritage urges that under the requirements of the J.O.A., the parties can orally consent to participate in drilling a well and, even if the J.O.A. is subject to the Statute of Frauds, the oral agreement comes within the partial performance exception to the Statute of Frauds and is therefore enforceable. Because of the unambiguous language of the J.O.A., we must disagree with Heritage.

## B. Unambiguous Contract Enforced as a Matter of Law.

It is undisputed that the 21 and 22 J.O.A.s were written binding contracts between the parties. Where a contract is unambiguous it is to be enforced as a matter of law and as it is written. *Coker,* 650 S.W.2d at 393–94; *R & P Enterprises,* 596 S.W.2d at 518–19. All the provisions of the agreement should be considered and construed together to ascertain the meaning and effect of the entire instrument. *Steeger v. Beard Drilling, Inc.,* 371 S.W.2d 684, 688 (Tex.1963); *Eagle Life Ins. Co. v. G.I.C. Ins. Co.,* 697 S.W.2d 648, 651 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). Furthermore, a contract is to be interpreted in accordance with its plain language. *Eagle Life Ins. Co.,* 697 S.W.2d at 650.

As stated by Heritage in their brief, consent to participate in a proposed operation is governed by Article VI.B.1. of the 22 J.O.A. which reads:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area other than the well provided for in Article VI.A., ... the party desiring to drill ... such a well shall give the other parties *written notice* of the proposed operation, specifying the work to be performed, the location, proposed depth, objection formation and the estimated cost of the operation. The parties receiving such

a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to *rework, plug back or drill deeper* may be given by telephone and the response shall be limited to forty-eight (48) hours.... Any notice or response given by telephone shall be promptly confirmed in writing. [Emphasis added].

This portion of the Article is clearly written in accordance with Article XII. of the J.O.A. which expressly requires that "notices authorized or required between the parties and required by any of the provisions of this agreement, *unless otherwise specifically provided,* shall be given *in writing* by mail or telegram...." [Emphasis added].

### 1. Consent.

█ Heritage argues that the case of *C & C Partners v. Sun Exploration and Prod.Co.,* 783 S.W.2d 707 714–15 (Tex.App.—Dallas 1989, writ denied) stands for the proposition that written consent to participate in a well is not required under the terms of a joint operating agreement.[2] The Court in *C & C Partners* held that because that contract was unambiguous and did not specify a particular form of consent, the Court was required to give effect to the intention of the parties as expressed in their writing. *C & C Partners,* 783 S.W.2d at 714–15. That Court then found that oral consent was sufficient to obligate the parties to participate in the well. *Id.* at 715.

The Dallas Court's conclusion is, however, only dicta, as the question in that case was whether or not consent had to be evidenced by means of a AFE. We certainly agree that consent or non-consent to participate in the drilling of a new well does not need to be in any particular form; however, we disagree that it can be oral. The *C & C Partners* Court concluded that the contract provisions only required written confirmation of responses to telephonic notices, and that since confirmation of consent was distinct and sep-

---

**2.** The exact version of the operation agreement in question in *C & C Partners* is not identified but it appears to be the 1982 version, as in the instant case.

arate from consent, there was no requirement of a writing. This logic fails for two reasons. First, telephonic notices and responses are limited by the operating agreement to "rework, plug back or drill deeper" operations and then only when the drill rig is on location. Article VI.B.1. Second, Article XII of the operating agreement provides:

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier....

We find Article XII to plainly require written consent or non-consent to a proposal to drill a subsequent well.

## 2. Proposal.

Even if oral consent to the drilling proposal were authorized, Heritage's oral proposal to drill a substitute well for the failing 22–2 well failed to satisfy the initial proposal requirements under the 22 J.O.A. Heritage was required, under Article XII. of the J.O.A., to propose the drilling of the new well by notice in writing, specifying the details of its development as required by Article VI.B.1. Such an oral proposal also violates the 22 J.O.A. by (1) proposing the well to fewer than all of the parties to the J.O.A., and (2) by failing to specify the details surrounding the development of the new well including location, depth, objective formation, and estimated cost.

Thus, Appellees' oral proposal for drilling the 22–3 well violated the provisions of the J.O.A. For the foregoing reasons, the alleged oral agreement to pay the 22–3 well costs in exchange for stopping drilling the 22–2 well fails as a matter of law.

## C. Statute of Frauds.

Hunt/Hill have also asserted that the J.O.A. is subject to the Statute of Frauds because it involves contracts for the sale of real estate. Heritage counters that even if the Statute of Frauds applies, the oral agreement is enforceable under the partial performance exception. We believe that Statute of Frauds does apply and the oral agreement

does not come within the partial performance exception to the doctrine because Heritage could not have relied on the oral agreement to its detriment.

## 1. The Rule.

Generally, mineral interests and oil and gas leaseholds are treated as real property interests. *Cherokee Water Co. v, Forderhause,* 641 S.W.2d 522, 525 (Tex.1982); *Mobil Exploration & Producing U.S., Inc. v. W.R. McDonald,* 810 S.W.2d 887, 890 (Tex. App.—Beaumont 1991, writ denied). As such, they are subject to the rules relating to real property including the Statute of Frauds. Tex.Bus. & Com.Code Ann. § 26.01 (Vernon 1987); *EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 267 (Tex.App.— Corpus Christi 1994, writ denied); *Vela v. Pennzoil Producing Co.,* 723 S.W.2d 199, 206 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). Specifically, the Statute of Frauds has been held to require that oil and gas leases and contracts for their transfer be in writing. *EP Operating Co.,* 883 S.W.2d at 267; *Vela,* 723 S.W.2d at 206. The joint operating agreement, in this case, also requires compliance with the Statute of Frauds. There are numerous sections within the agreement which make the Section 22 leases "subject to" its terms and vice versa. Specifically, the 22 J.O.A. states under Article VIII.A. that the "leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto." Thus, the 22 J.O.A. necessarily governs the transfer of interests in the oil and gas leases subject to the agreement. The incorporation by reference of the lease interests makes the J.O.A. a part of the real property leases. *See S & D Group, Inc. v. Talamas,* 710 S.W.2d 680, 683 (Tex.App.— Corpus Christi 1986, writ ref'd n.r.e.). Thus, both agreements must be read and construed together. *Id.; Estrada v. River Oaks Bank & Trust Co.,* 550 S.W.2d 719, 726 (Tex.Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Volunteer State Life Ins. Co. v. Snipes,* 209 S.W.2d 935, 936 (Tex.Civ.App.— San Antonio 1948, no writ). As such, the

leases and the J.O.A. are subject to the Statute of Frauds.

Finally, the oral agreement which is the basis for Heritage's breach of contract claim involves more than just the obligation of Hunt/Hill to pay a share of the costs of the 22–3 well. Because the objective of the 22–3 well was to reach the Ellenburger formation at a depth of approximately 22,000 feet, and since the 22 J.O.A. was limited to maximum depth of 20,000 feet, the oral agreement would also constitute a material amendment of the J.O.A. depth limitations requiring it to be in writing. *Dracopoulas v. Rachal*, 411 S.W.2d 719, 721 (Tex.1967); *Lone Star Steel Co. v. Reeder*, 407 S.W.2d 28, 31 (Tex.Civ. App.—Texarkana 1966, writ ref'd n.r.e.). There is no evidence that the parties made a written, or oral, modification of the depth limitation as contained in the J.O.A. Consequently, the Statute of Frauds bars enforcement of the this agreement and precludes any recovery for its breach.

## 2. Partial Performance Exception.

The Statute of Frauds will not bar the enforcement of an oral contract where there is partial performance by the party seeking to enforce the contract. *Leon Ltd. v. Albuquerque Commons Partnership*, 862 S.W.2d 693, 702 (Tex.App.—El Paso 1993, no writ); *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex.App.—Texarkana 1989, no writ); *Oak Cliff Realty Corp. v. Mauzy*, 354 S.W.2d 693, 695 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n.r.e.). However, in order to take the oral contract out of the Statute of Frauds, one party must perform *in reliance* upon the contract so that failure to enforce the contract would result in a "virtual fraud" as one party has incurred a substantial detriment and the other has reaped an unearned benefit. *Central Power and Light Co. v. Del Mar Conservation Dist.*, 594 S.W.2d 782, 790 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.); *Manzell v. Hightower*, 159 S.W.2d 552, 554 (Tex.Civ.App.—Texarkana 1942, no writ).

The oral agreement upon which Heritage premises its recovery was entered into in May of 1987. As early as September 1987, the Hunts had advised Heritage that they wanted Heritage to bring operations to a stand still and not conduct any further drilling activities. In a September 28, 1987 letter from Hunt/Hill, Heritage was notified by the Hunts that a "vote" of the Non-Operators had been taken and that Heritage had been removed as Operator. Heritage was further advised that Tribal Drilling would be taking over operations and that Heritage should perform only "routine and necessary production, operating, and maintenance operations" until that time. On October 26, 1987, Heritage held an Operator's meeting discussing the 22–3 well. The Hunts, in attendance, contested the drilling of the 22–3 well and asserted that no wells should be drilled pending Heritage's sale of its own interests in the wells. In November, the Hunts' attorney advised Heritage that the 22–3 well, was outside the contract area as contemplated by the J.O.A. because it was proposed to a depth of 22,000 feet. Finally, on December 18, 1987, Tribal Drilling filed an action in Dallas County seeking judgment that Heritage owned no interest in the contract area and requesting a temporary restraining order to cease Heritage's operations. On December 28, 1987, Heritage began drilling operations on the 22–3 well.

In light of the numerous repudiations of the alleged oral agreement between the Hunts and Heritage, as well as the initiation of drilling operations on the 22–3 well *after* suit was brought to enjoin Heritage from such drilling, we do not find that Heritage's performance under the oral contract was done in reliance upon the oral contract. Consequently, there is no performance such that refusal to enforce the agreement would result in a "virtual fraud" upon Heritage as its actions, as a matter of law, were not done in good faith reliance upon the May oral agreement. In light of our determination that the performance exception to the Statute of Frauds does not apply in this instance, we find that Heritage's claim for breach of the 22 J.O.A. is barred as a matter of law.

Point of Error 54b is sustained and because of this resolution, we do not address the remaining Points of Error 54a, c, and 55.

## X.

### Remainder of Points of Error.

*Points of Error 21, 43a, 45, 46, 47, 48, 49, 50, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63.*

### A. Exclusion of Findings of the Railroad Commission.

Hunt/Hill challenge the trial court's refusal to admit into evidence or judicially notice the Railroad Commission's Proposal for Decision on Heritage's Field Designation Application. At trial, Hunt/Hill admitted into evidence the Texas Railroad Commission's Final Order which denied Heritage's request for authorization from the Commission to complete the 22-3 well in the same reservoir as the 22-2 well. The Commission's Final Order adopted as its own the findings of fact and conclusions of law of the Examiner's Proposal for Decision ("PFD"). The PFD stated in Findings of Fact 33 that Heritage intended the 22-3 well to be a test of the Silurian interval already being produced by the 22-2 well.

Hunt/Hill attempted to enter into evidence the entire PFD, or alternatively, Findings of Fact 33. The trial court refused to admit either. Hunt/Hill then requested that the trial court take judicial notice of the PFD; the request was denied. Hunt/Hill now contend that the excluded evidence conclusively establishes that Heritage breached its duties under the Section 22 J.O.A. and that the Railroad Commission's findings of fact give rise to collateral estoppel.

### 1. Trial Court's Refusal to Admit PFD into Evidence.

Admission or exclusion of evidence is a matter within the trial court's discretion. *Syndex Corp. v. Dean,* 820 S.W.2d 869, 873 (Tex.App.—Austin 1991, writ denied); *Dudley v. Humana Hosp. Corp.,* 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ). To obtain a reversal of judgment based upon a trial court's decision to admit or exclude evidence, the appellant must show: (1) that the trial court abused its discretion in making the decision; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); Tex.R.App.P. 81(b), 49 Tex.B.J. 561 (Tex.1986, superseded 1997). Because it is impossible to prescribe a specific test for making the latter determination, it is a "judgment call entrusted to the sound discretion and good senses of the reviewing court" which must be made by an evaluation of the entire case. *Lorusso v. Members Mut. Ins. Co.,* 603 S.W.2d 818, 821 (Tex.1980).

It has been held that when evidence is sharply conflicting and the case is hotly contested, any error of law by the trial court will be reversible error under Rule of Appellate Procedure 81(b)(1), 49 Tex.B.J. 561 (Tex. 1986, superseded 1997). *Lorusso,* 603 S.W.2d at 821; *Nix v. H.R. Management Co.,* 733 S.W.2d 573, 576 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.)(reversing hotly contested case for erroneous admission of evidence). But, the Supreme Court has also stated that error in admitting evidence will not require reversal unless that evidence controlled the judgment. *Gee,* 765 S.W.2d at 396. If other competent evidence of the fact in question appears in the record, improper admission of evidence will not constitute reversible error. *Id.* at 397. Thus, evidentiary rulings will not cause reversal unless the appellant demonstrates that the whole case turns on the evidence improperly admitted or excluded. *Superior Derrick Servs., Inc. v. Anderson,* 831 S.W.2d 868, 876 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Shenandoah Assoc. v. J & K Properties, Inc.,* 741 S.W.2d 470, 493 (Tex.App.—Dallas 1987, writ denied).

The record reflects that the facts contained within the PFD were introduced at different times through the trial by various witnesses. Furthermore, the subject matter of Findings of Fact 33 was the basis of testimony by more than one witness at trial and evidence contradicting Findings of Fact 33 was even introduced. Findings of Fact 33 and the PFD, were therefore, merely cumulative evidence and the trial court committed no error in excluding it as evidence at trial. Hunt/Hill's Points of Error 59a and 59c are overruled.

## 2. Trial Court's Refusal to Take Judicial Notice of the PFD.

 Texas Rule of Civil Evidence § 201 imposes a mandatory obligation upon a trial court to judicially notice facts: (1) if properly requested by a party; (2) if the court is supplied with the appropriate information; and (3) if the fact is of a kind that may properly be noticed. TEX.R.CIV.EVID. 201(b) & (d). Since it is undisputed that Hunt/Hill properly requested judicial notice and supplied the court with the appropriate information, we need only address whether the PFD of the Railroad Commission was the proper subject matter for judicial notice. A judicially noticed fact must be one that is not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. TEX.R.CIV.EVID. 201(b). Matters that may be judicially noticed are often divided into three categories: adjudicative facts; legislative facts; and law. 2 Kenneth S. Brown, et al., McCORMICK ON EVIDENCE § 328, at 385–88 (John W. Strong ed., 4th ed.1992). Adjudicative facts are those to which the law is applied in the process of adjudication. Thus, when a court or an agency finds facts concerning the immediate parties, including who did what, where, when, how, and with what motive or intent, the court or agency is performing an adjudicative function, and the facts are called adjudicative facts. 2 Kenneth S. Brown, et al., McCOR-MICK ON EVIDENCE at 385.

 The Railroad Commission conducted a five day hearing where the parties were represented by counsel and witnesses testified to the circumstances concerning Heritage's application to drill the 22–3 well. After the contested evidentiary proceeding, the Commission made its findings of fact and conclusions of law and executed a final order prohibiting the drilling of the 22–3 well. The final order and its accompanying PFD were duly published and are matters of public record. As such, the trial court erred in refusing to take judicial notice of the published order and PFD of the Railroad Commission. *See Office of Pub. Util. Counsel v. Pub.*

*Util. Comm'n of Texas,* 878 S.W.2d 598, 600 (Tex.1994)(holding that the court of appeals erred by failing to take judicial notice of readily determinable facts contained in a published PUC order). However, because of the cumulative nature of the evidence contained in the PFD, we find that the trial court's error in refusing to judicially notice the PFD constitutes harmless error. There was other competent evidence of Heritage's intentions of drilling the 22–3 well such that the omitted evidence could not have controlled the judgment. Point of Error 60a is overruled.

## 3. Collateral Estoppel.

 Hunt/Hill argue that Findings of Fact 33 of the Railroad Commission PFD collaterally estops Heritage from denying that it intended the 22–3 well to be a test of the Silurian interval already being produced by the 22–2 well. This fact, Hunt/Hill aver, establishes that Heritage breached the 22 J.O.A. because Heritage was attempting to complete the 22–3 well in the same source of supply as the 22–2 well without the mutual consent of all parties to the J.O.A. Heritage's removal as Operator of Section 22 would therefore have been warranted because of this breach of the J.O.A.

 Collateral estoppel is an affirmative defense and as such, the party asserting such a defense has the burden of pleading and proving its elements. *Williams v. National Mort. Co.,* 903 S.W.2d 398, 401 (Tex.App.—Dallas 1995, writ denied). Under a plea of collateral estoppel, essential issues of fact previously determined and adjudged by a court of competent jurisdiction are binding in a subsequent action between the same parties. *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). The doctrine not only applies to judgments but also to the decisions of an administrative agency where the administrative agency has acted in a judicial capacity and resolved disputed issues of fact properly before it where the parties had adequate opportunity to litigate. *Muckelroy v. Richardson Indep. Sch. Dist.,* 884 S.W.2d 825, 830 (Tex.App.—Dallas 1994, writ denied)(*citing Bryant v. L.H. Moore Canning Co.,* 509 S.W.2d 432, 434 (Tex.Civ.

App.—Corpus Christi), *cert. denied,* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 74 [1974] ); *Railroad Comm'n v. Phillips,* 364 S.W.2d 408, 411 (Tex.Civ.App.—Austin 1963, no writ). Finally, the issue of the application of the doctrine of collateral estoppel is a question of law for the court. *Price v. Texas Employers' Ins. Ass'n,* 782 S.W.2d 938, 940 (Tex.App.—Tyler 1989, no writ).

In the instant case, Hunt/Hill urge that they pled in their answer to plaintiff's petition that the Railroad Commission's findings of fact gave rise to collateral estoppel. However, the record before us is void of any motion for summary judgment or motion to dismiss the issues previously decided by the Commission on the basis of res judicata or collateral estoppel. Therefore, there is no order from the trial court denying such motion and preserving such error. Furthermore, during trial, Hunt/Hill attempted to prove the admissibility of the Commission's Order and PFD apparently on the basis of relevancy to the proceedings, not on the basis of collateral estoppel. Bearing the burden of establishing their affirmative defense of collateral estoppel, Hunt/Hill were obligated to plead and prove its elements. Having failed to obtain a ruling, not on the admissibility as evidence, but on the issue of collateral estoppel of the issues litigated before the Railroad Commission, we find there can be no error in this regard.

■■■ Moreover, any error in failing to admit into evidence, or judicially notice, the Commission's PFD is harmless error. Findings of Fact 33 specifically found that Heritage *intended* that the 22–3 well be a test of the Silurian interval. Hunt/Hill contend that this "intention" finding establishes that Heritage breached the provision of the J.O.A. which provides that "without the mutual consent of all parties, no well shall be *completed in or produced* from a source of supply from which a well located elsewhere on the Contract Area is producing...." [Emphasis added]. However, Findings of Fact 23 of the PFD found that "it was never the *intention* of Heritage Resources, Inc., to *complete* the No. 22–3 well in the Crittendon (Silurian) Field. Heritage knew that the existence of the No. 22–2 well in that field on a 640 acre

lease prevented a regular permit for the No. 22–3 well." [Emphasis added]. Thus, Findings of Fact 23 clearly negates Hunt/Hill's position as to Heritage's breach of the J.O.A. provision. Accordingly, we find that any error by the trial court in failing to admit the PFD was harmless. Points of Error 59b and 60b are overruled.

**B. Declaratory relief by Hill that:**

Hunt/Hill contend in Points of Error 48 thru 52 that the trial court erred in awarding Heritage declaratory relief and denying Hunt/Hill's requested declaratory relief. The only declaratory relief granted by the trial court was as follows:

> IT IS FURTHER ORDERED and DECLARED that Heritage Resources, Inc. has since on or before December 17, 1987 owned an interest in Sections 21 and 22 of Block C–23, PSL Survey, Winkler County, Texas and that such interest was sufficient for Heritage to serve as operator of those Sections under the Joint Operating Agreements to those Sections. ("Declaration One")

> IT IS FURTHER ORDERED and DECLARED that Heritage Resources, Inc. has not breached any of its duties under the Joint Operating Agreements to Sections 21 and 22, Block–23, PSL Survey, Winkler County, Texas. ("Declaration Two")

Hunt/Hill challenge the trial court's granting of declaratory relief claiming that the court erred in submitting questions of law, or questions which were the subject of undisputed evidence, to the jury. Specifically, Hunt/Hill challenge five of the jury's findings upon which such declaratory relief was premised. First, Hunt/Hill challenge the jury's finding in response to Questions 1 and 3, that Heritage did not breach any of its duties under the Section 21 and 22 J.O.A.s before or after September 1987. Secondly, Hunt/Hill challenge the jury's finding in response to Question 8, that the 22–3 well was covered by the Section 22 J.O.A. Thirdly, Hunt/Hill challenge the jury's finding in response to Question 11, that the Defendant's failure to comply with the Section 22 J.O.A. was not excused. Lastly, Hunt/Hill challenge the

jury's finding in response to Question 46, that Heritage owned an interest in the Section 21 and 22 Contract Areas on or before December 17, 1987.

A disagreement over the interpretation of a contract clause does not render the clause ambiguous. *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 136 (Tex.App.—El Paso 1991, no writ). When the parties disagree over the meaning of an unambiguous contract, the court must determine the parties' intent from the agreement itself, not from the parties' present interpretation. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–732 (Tex.1981); *First City Nat'l Bank of Midland*, 808 S.W.2d at 136; *KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex.App.—Houston [1st Dist.] 1987, writ denied). Where a contract is unambiguous it need only be enforced as a matter of law. *R & P Enters.*, 596 S.W.2d at 518. In construing an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so that none is rendered meaningless. *First City Nat'l Bank of Midland*, 808 S.W.2d at 137 (*citing Coker v. Coker*, 650 S.W.2d 391, 393 [Tex. 1983] ).

**1. Declaration One—Interest to Serve as Operator.**

 In order to properly serve as operator under the J.O.A., the operator must own an "interest" in the contract area. However, neither the Section 21 J.O.A. nor the Section 22 J.O.A. contains a definition of the term "interest." Hunt/Hill argue that Heritage had to possess a cost bearing interest. Heritage argues record title is sufficient. Thus, the issue becomes whether record title qualifies as an interest sufficient to satisfy the J.O.A.

 Interpretation of an unambiguous contract term is a question of law for the trial court. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *C & C Partners*, 783 S.W.2d at 715. Consequently, it was improper for the trial court to submit the question to the jury. In reviewing questions of law, we grant no deference to the judgment of the trial court, rather we independently review the decision.

*In the Matter of Humphreys*, 880 S.W.2d 402, 404 (Tex.1994).

Hunt/Hill had the burden to prove that Heritage did not own an interest at a time that two or more working interest owners voted for its removal. Exhibit A to the 22 J.O.A. contains a listing of all "Interests of the Parties." Within this listing are seventeen names and two columns of percent interests labeled "Before Payout Working Interest" and "After Payout Working Interest." Heritage is at the very top of the list with a significant percent interest before and after payout. Thus, at the time of the signing of the J.O.A., Heritage was disclosed as an interest owner. Hunt/Hill presented no evidence that Heritage's entire interest under the Section 22 J.O.A. had been transferred or conveyed after the signing of the J.O.A.

Citing to several property cases, Hunt/Hill argue that there is a distinction between "record title" and "ownership." However, this argument is futile in light of unequivocal trial testimony. Hunt/Hill's own attorney, Michael Nugent, testified that by signing the J.O.A., Heritage assumed a cost-bearing interest which obligated them to pay a proportionate share of the costs of drilling wells on Section 22. Moreover, there was expert testimony from Marvin Wigley, a member of the committee of the American Association of Petroleum Landmen that drafted the A.A.P.L. Form 610, used for the Section 21 and 22 J.O.A.s, that record title is a sufficient interest to satisfy the ownership interest requirement for operator status under the J.O.A.

The sum total of Hunt/Hill evidence in support of their contention that Heritage had to possess a cost bearing interest is the argument that without such a requirement the operator would have no incentive to minimize costs and that non-operators would be left unprotected. In light of the testimony of Hunt/Hill's own attorney stating that Heritage did possess a cost-bearing interest, Hunt/Hill's argument must fail. Furthermore, given the fact that Heritage was listed as a working interest owner, and that expert testimony revealed that record title is sufficient under the J.O.A., we conclude, as a

matter of law, that record title is sufficient to satisfy the interest requirement for operator status under the Section 21 and 22 J.O.A.s.

### 2. Declaration Two—Breach of the J.O.A.

The jury found that Heritage had not breached the J.O.A. The trial court entered a declaratory judgment that "Heritage ... has not breached any of its duties...." Whether or not Heritage did in fact breach any of its duties under the J.O.A. was a question of fact and was therefore, properly submitted to the jury. The jury found that Heritage had not breached the J.O.A.s. In a suit for declaratory judgment "a court ... has power to declare rights, status, and other legal relations...." TEX.CIV.PRAC. & REM.CODE ANN. § 37.003. Furthermore, a trial court having jurisdiction to render a declaratory judgment has the power to determine issues of fact. *United Servs. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 858 (Tex.1965); *Bexar–Medina–Atascosa Counties Water Control and Improvement Dist. No.1 v. Medina Lake Protection Ass'n*, 640 S.W.2d 778, 779 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). However, the power to determine an issue of fact does not concomitantly carry with it the power to render such a finding of fact as a declaratory judgment. The determination of whether a party has breached a contract, while affecting a party's rights or status, is not a declaration of a right or status and therefore, is not the proper subject of a declaratory judgment. The only matter that was to be resolved was the purely factual question of whether or not Heritage breached the J.O.A. If a factual dispute is the only issue to be resolved, a declaratory judgment is not the proper remedy. *Emmco Ins. Co. v. Burrows*, 419 S.W.2d 665, 671 (Tex.Civ.App.—Tyler 1967, no writ); *Lincoln v. Harvey*, 191 S.W.2d 764, 766 (Tex. Civ.App.—Dallas 1945, no writ). Accordingly, we find that Declaration Two was not the proper subject matter for a declaratory judgment.

Hunt/Hill next contend that there was legally insufficient evidence, or alternatively, it was against the great weight and preponderance of the evidence, for the jury to find that Heritage did not breach any of its duties under the J.O.A.s. Hunt/Hill proffer three instances which they claim unequivocally establish Heritage's breach of the J.O.A.s. First, Hunt/Hill argue that Heritage's insolvency resulted in its automatic deemed resignation. However, Hunt/Hill drafted the jury questions regarding Heritage's status as Operator. Broad form questions were used and Hunt/Hill did not request an issue on Heritage's bankruptcy as it affected its status as Operator. Therefore, any error is waived. *See* TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997). Additionally, there is evidence that there was never a vote to remove Heritage as Operator during pendency in bankruptcy which is required for removal under the J.O.A.

Second, Hunt/Hill contend that Heritage engaged in wrongful billing practices. However, there is substantial evidence that the Hunts and Hills knew of and agreed to "vendor deals." Furthermore, expert testimony revealed that the J.O.A. would not prohibit "vendor deals." Finally, Hunt/Hill argue that Heritage failed to obtain the requisite consent for the perforation of the 21–1 well. In support of this argument, Hunt/Hill claim that there had to be written authorization. Noting our previous discussion on breach of contract, written consent was required for the proliferation of the 21–1 well. However, there was some evidence presented on this issue indicating that a request was made by the Hunts for Heritage to conduct further activity on the 21–1 well. Thus, considering all three points of dispute, we cannot hold that the jury's finding that Heritage did not breach its duties under the J.O.A. was against the great weight and preponderance of the evidence. There was sufficient evidence to support the jury's finding that Heritage did not breach its duties under the J.O.A. Therefore, the trial court was proper in granting Heritage's declaratory relief with respect to Declaration One but not with respect to Declaration Two. Furthermore, in light of this analysis, the trial court was correct in denying all of Hunt/Hill's requests for declaratory relief relating to Heritage's performance as Operator. Also, due to our disposition of the other points of error regarding the 22–2 well and the Section 22 J.O.A. and our analysis of the other issues of

declaratory judgment, we cannot find that the trial court erred in denying Hunt/Hill other requests for declaratory relief as they relate to the 22–2 well. Points of Error 48, 49, 50, 51, and 52 are overruled.

## C. Recovery Against Distributees of A.G. Hill and the Hill Group.

Hunt/Hill further complain of the trial court's granting of relief against A.G. Hill's successors in interest on two grounds. First, Hunt/Hill contend that as of the filing of the May 1, 1992 First Amended Petition, the statute of limitations on all claims asserted against these defendants had run and that therefore, any recovery was precluded as a matter of law. Secondly, Hunt/Hill argue that these parties were not properly substituted into the lawsuit. A.G. Hill was a named defendant in Heritage's original petition filed on December 18, 1987. Mr. Hill died in June of 1988, during the pendency of this litigation. On May 1, 1992, Heritage added Margaret Hunt Hill, Executrix of the Estate of A.G. Hill, and the Margaret Hunt Hill Martial Trust, the Albert G. Hill, III Trust, the Heather Victoria Hill Trust, the Elisa Margaret Hill Trust, the Michael Bush Wisenbaker, Jr. Trust, the Wesley Hill Wisenbaker Trust, Cody McArthur Wikert Trust, and the Margretta Hill Wikert Trust, as defendants in its first amended petition as A.G. Hill's successors-in-interest.

## 1. Statute of Limitations.

Heritage's original petition was sufficient to put in issue a cause of action against A.G. Hill for fraud. The fraud upon which Heritage sought recovery was the alleged May 1987 oral agreement whereby the Hunts agreed to pay their share of the drilling costs of the 22–3 well. Since the cause of action preceded the filing of Heritage's original petition, it was therefore a ripe claim and the trial court was properly vested with subject matter jurisdiction as of the date of filing the Original Petition. Accordingly, Heritage's first amended petition, which was based in part upon this same transaction relates back to the original petition in accordance with TEX.CIV.PRAC. & REM.CODE ANN. § 16.068. Therefore, Heritage's recovery against these defendants, if properly substituted as A.G. Hill's successors in interest, will not be precluded on the basis of statute of limitations.

## 2. Proper Parties.

Hunt/Hill next argue that there is absolutely no evidence that either the distributees of A.G. Hill or anyone else in the Hill Group, other than Virgil St. Clair and A.G. Hill, engaged in any actionable misconduct and that therefore, recovery against them is improper. However, with regard to the joinder of A.G. Hill's distributees as proper party defendants, Hunt/Hill did not file a Verified Answer denying liability in the capacity in which they were being sued or asserting the existence of a defect in parties. TEX.R.CIV.P. 93. Additionally, the parties voluntarily entered the lawsuit by joining in the counterclaim. Furthermore, Hunt/Hill wholly failed to object to their inclusion in the jury questions. Consequently, any error based upon this theory is waived by failure of the parties to object. TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997); *Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex. 1988). Hunt/Hills' Points of Error 61a and 61b are overruled.

Likewise, the record reflects that Heritage's Second Amended Petition alleged that A.G. Hill and Virgil St. Clair were the apparent ostensible agents of the entire Hill group. The Hill Group's answer failed to deny any of these agency allegations. Furthermore, Hunt/Hill did not object to any jury question or jury issue which included them as defendants on the grounds of lack of evidence of agency, or any other grounds. Consequently, any error based upon this theory is waived by the parties' failure to object. TEX.R.APP.P. 52(a), 49 TEX.B.J. 561 (Tex.1986, superseded 1997); *Lemons*, 747 S.W.2d at 373. Accordingly, Hunt/Hill's Points of Error 56, 57, and 58 are overruled.

## D. Duplication of Damages.

Hunt/Hill allege in Points of Error 21 and 43a that the trial court erred in overruling their motions for new trial, motions to disregard jury answers, and for judgment notwithstanding the verdict, and in entering

judgment against them because the damages awarded by the jury in Questions 21, 25, 32, 37a, and 37b are duplicative of one another. In light of our holding that Heritage is not entitled to recover on any of its tortious interference or slander of title claims, with the sole exception of the claims regarding the Oxford transaction, and in light of our disposition of Point of Error 28b, we need not address Points of Error 21 and 43a.

### E. Damages Awarded to Van Oliver, Trustee.

In Point of Error 62, Hunt/Hill urge that the trial court erred in awarding damages in favor of the Intervenor Van Oliver, Trustee because the Trustee's claims and damage award are derivative of Heritage's claims and damages. It appears from the record that all parties to the action stipulated to an *agreement whereby Van Oliver, Trustee, for the benefit of certain trade creditors of Heritage,* would receive 15 percent of any award Heritage received in the suit. Appellees agree that the Trustee's recovery is derivative of Heritage's recovery and as such, is directly portional to Heritage's award. It therefore appears that the judgment must be reformed to reflect that Van Oliver's award is to be recovered from Heritage's award. We sustain Point of Error 62.

### F. Seven Falls Company.

 Hunt/Hill claim in Point of Error 63 that the trial court erred in entering judgment against Seven Falls Company and in denying the corporation's motion to strike all claims against it. Seven Falls Company was first named as a party to the suit by the Hill Group's counterclaim filed August 17, 1992. However, it is undisputed that Seven Falls was not named as a party in either the First Amended Counterclaim or Second Amended Counterclaim filed by the Hill Group Hunt/Hill on August 19, 1992 and September 22, 1992, respectively. Appellees argue that Seven Falls remained a party after the filing of the Hill Group's counterclaim on August 17, 1992, despite the omission of Seven Falls from the first and second amended counterclaims because Seven Falls did not file nonsuit after that date.

Under Texas Rule of Civil Procedure 65, an amended pleading supersedes and supplants the original pleading. In *Burton v. Bridges*, 641 S.W.2d 635, 637 (Tex.App.—El Paso 1982, writ ref'd n.r.e.), we held that under Rule 65 "[p]arties to a suit are just as effectively dismissed from a suit by omitting their names from an amended pleading as where a formal dismissal order is entered." *See Evans v. Hoag*, 711 S.W.2d 744, 746 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Dingman v. Spengler*, 371 S.W.2d 416, 423–424 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.). Thus, as Hunt/Hill have correctly argued, Seven Falls Corporation was not a party to the action once the first amended counterclaim omitted them as a defendant.

Upon filing their second amended original petition and original answer, Heritage included Seven Falls as a defendant. However, Hunt/Hill argue that Seven Falls was never served with process. Heritage does not contend that Seven Falls was served with process but instead relies on Seven Falls' voluntary joinder in the suit by way of the original counterclaim. Because we find that the omission of Seven Falls from the amended counterclaims effectively dismissed them from the suit, it was Appellees' burden to serve Seven Falls with citation in accordance with Texas Rule of Civil Procedure 99. *See Evans*, 711 S.W.2d at 746. Appellees failed to comply with such rules. Hunt/Hill made a motion to strike all claims against Seven Falls Company and obtained an unfavorable ruling from the trial judge. However, regardless of the title of the motion, Hunt/Hill substantively argued the improper joinder of Seven Falls as a defendant. *See Cherry v. North Am. Lloyds of Texas*, 770 S.W.2d 4, 6 (Tex.App.—Houston [1st Dist.] 1989, writ denied)(opin. on motion for reh'g). For the foregoing reasons, we sustain Hunt/Hill's Point of Error 63 and find that the trial court erred in denying the motion to strike and in entering judgment against Seven Falls Company.

### G. Attorney's Fees.

 Hunt/Hill challenge the trial court's award of attorney's fees in Points of Error 45, 46, and 47. The trial court award-

ed Heritage attorney's fees based upon a percentage of Heritage's total recovery at trial. There is no common law right to attorney's fees. Instead, the recovery of attorney's fees must be authorized by statute or contract. *Dallas Cent. Appraisal Dist. v. Seven Invest. Co.*, 835 S.W.2d 75, 77 (Tex. 1992); *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex.1967). Additionally, if a case involves more than one claim, then only those fees attributable to the claim falling within the scope of such statute or contract are recoverable. *International Sec. Life Ins. Co. v. Finck*, 496 S.W.2d 544, 546–547 (Tex.1973); *4M Linen Supply Co., Inc. v. W.P. Ballard & Co., Inc.*, 793 S.W.2d 320, 327 (Tex.App.—Houston [1st Dist.] 1990, writ denied). "[T]he plaintiff is required to show that the fees were incurred while suing ... on a claim which allows recovery of such fees." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991); *Harmes v. Arklatex Corp.*, 615 S.W.2d 177, 180 (Tex.1981). However, segregation is not required if services are rendered "in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *Stewart Title Guar. Co.*, 822 S.W.2d at 11.

▮ Heritage asserts three bases for upholding the award of attorney's fees: (1) contract; (2) declaratory judgment; and (3) real estate fraud. Since no jury issue or question was either requested or presented on the real estate fraud question, and no recovery was had on a claim of real estate fraud, the fees are unsupportable under this theory. Likewise, because we have determined that the Statute of Frauds bars enforcement of the May oral agreement, Heritage's claim for breach of contract fails as a matter of law and consequently, there can be no recovery of attorney's fees based upon this ground. Therefore, only Heritage's suit for declaratory judgment will support the trial court's award of attorney's fees.

▮ The trial court granted Heritage two forms of declaratory relief. "In any proceeding [for declaratory judgment] the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX.CIV.PRAC. & REM.CODE ANN. § 37.009. The award of such costs and fees is within the discretion of the trial court and such an award premised upon an action for declaratory judgment will not be disturbed on appeal absent a clear showing of an abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Knighton v. International Bus. Mach. Corp.*, 856 S.W.2d 206, 210 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Where a plaintiff pleads several causes of action including a request for a declaratory judgment and for an award of attorney's fees and is subsequently awarded declaratory relief but denied other relief, he is only entitled to those attorney's fees attributable to the declaratory judgment action. *Leon Ltd. v. Albuquerque Commons Partnership*, 862 S.W.2d 693, 708 (Tex. App.—El Paso 1993, no writ); *Canales v. Zapatero*, 773 S.W.2d 659, 662 (Tex.App.— San Antonio 1989, writ denied). Accordingly, because we find that Heritage's tort causes of action entailed proof of facts unnecessary for the declaratory judgment and considering the percentage basis of the award which did not segregate the fees attributable to the declaratory action, we must reverse the trial court's award of attorney's fees and remand for new trial on the issue of reasonable and necessary attorney's fees under TEX.CIV. PRAC. & REM.CODE ANN. § 37.009. Accordingly, we overrule Point of Error 45a, and we sustain Points of Error 45b, c, and 46, and we need not address Point of Error 47.

## XI.

### Cross Points of Appeal.

*Cross Points of Error 1 and 2.*

On cross-appeal, Heritage complains of the trial court's actions of: (1) not awarding prejudgment interest compounded on a daily basis rather than compounded as simple interest and failing to award prejudgment interest for the period Heritage was in bankruptcy; and (2) failing to award attorney's fees for the law firm of Gibson, Dunn & Crutcher in the amount of $1,172,038.30. Because of our disposition of Hunt/Hill's points of error, there remains no economic recovery for Appellees which would require the award

of prejudgment interest, and therefore, we decline to address Appellees' Cross Point One. Furthermore, in light of the determination to remand the case for retrial on the issue of attorney's fees, we also decline to address Cross Point Two.

## CONCLUSION

We sustain the following Points of Error: 1b, c, 2a, 4, 9b, c, e, 11a, b, 15, 19, 22, 23b, c, d, e, f, 24a, 28b, 32b, 33, 36b, 37, 40b, 41, 43b, 44, 45b, c, 46, 54b, 62, and 63.

We overrule the following Points of Error: 1a, d, e, 3, 5, 6a, 7, 8, 9a, d, 10a, 12, 13, 14a, 16, 17, 18a, 20, 23a, 25, 26, 27, 28a, 29, 30, 31a, 34, 35a, 38, 39a, 42, 45a, 48, 49, 50, 51, 52, 53, 56, 57, 58, 59, 60, and 61.

The following Points of Error are either dismissed or not considered: 2b, 6b, 10b, 14b, 18b, 21, 24b, 31b, c, d, e, f, 32a, c, 35b, c, d, e, f, 36a, c, 39b, c, d, e, f, 40a, c, 43a, 47, 54a, c, and 55. Further, it is not necessary to consider any of the Appellees' Cross Points of Error.

We therefore:

- affirm the trial court's judgment of fraud and award of actual damages in the amount of $4,989,347.21;

- affirm the trial court's judgment of tortious interference with the Oxford transaction and award of actual damages in the amount of $3,160,031.69, but reverse and render that Appellees take-nothing on their claim of slander of title regarding the Oxford transaction;

- reverse and render that Appellees take-nothing on their claims of tortious interference and slander of title regarding: the non-consent interests pertaining to the 22–3 well, the Sun, Enserch/Lone Star, and Enron transactions;

- reverse and render that Appellees take-nothing from Seven Falls Corporation;

- reverse and remand for new trial on attorney's fees, if any; and

- reverse and remand for reformation of the trial court's judgment as to the inter-

venor, Van Oliver, Trustee, in accordance with this opinion.